563 P.2d 395

Glenn E. BANDELIN, Plaintiff-Appellant,

v.

L. E. PIETSCH et al.,
Defendants-Respondents.

No. 11953.

Supreme Court of Idaho.

March 14, 1977.

Rehearing Denied May 13, 1977.

Peter B. Wilson, of Wilson & Walter, Bonners Ferry, for plaintiff-appellant.

Piatt Hull, of Hull, Hull & Wheeler, Wallace, Fred W. Gilbert, of Hamblen, Gilbert & Brooke, Spokane, Wash., for defendants-respondents.

DONALDSON, Justice.

This case is an action for libel and invasion of privacy. Plaintiff-appellant Glenn Bandelin appeals from a grant of summary judgment. Glenn E. Bandelin is a North Idaho attorney and is also a former office holder in the state legislature. On December 19, 1968, the probate court of Bonner County appointed him guardian of the person and estate of one Muriel I. Talbot who had been found incompetent on the same date. She died on January 2, 1970. Bandelin did not initiate proceedings for a final accounting until March 25, 1971. At that time, the district court concluded that Bandelin's management of the estate had been negligent in the extreme and ordered the prosecuting attorney of Bonner County to initiate contempt proceedings against him.

Over a period of several months, the Sandpoint News-Bulletin reported the ensuing legal proceedings. Accounts of the proceedings occurred in eleven consecutive editions of the Sandpoint News-Bulletin. There were seventeen publications *in toto.* These accounts gave rise to Bandelin's allegations of libel and invasion of privacy. He claims that the accounts contained misstatements of fact and that they were deliberately repetitious.

From the record it appears that misstatements appeared in the August 19 and August 26 editions of the Sandpoint News-Bulletin. The August 19 edition referred to two Sandpoint attorneys "judged in contempt of a district court decision and order concerning their handling of the guardianship and estate of the late Mrs. Muriel Talbot." At a later point in the article they were cited by name. In the August 26 edition the same misstatement is made twice. Although plaintiff was later judged in contempt by the district court (a conviction that was overturned by the Idaho Supreme Court on procedural grounds), at the time the above accounts were written his case had not come to trial and hence he had not as yet been adjudged in contempt. The Sandpoint News-Bulletin did accurately report future developments in the case—Bandelin's conviction, the appeal that followed and the Supreme Court's reversal of the lower court's decision, but it never made a retraction of the earlier misstatements.

Bandelin brought a libel action along with an invasion of privacy action against the Sandpoint News-Bulletin, as well as its editor, L. E. Pietsch, and the reporter responsible for the allegedly defamatory pub-

lications, Morgan Monroe. After extensive discovery, the Sandpoint News-Bulletin moved for summary judgment. The district court, after examining the record as well as supplementary briefs and affidavits, granted the Sandpoint News-Bulletin's motion. This appeal followed.

Two issues are raised on appeal. First, were the allegedly defamatory newspaper publications privileged under the first amendment. Second, assuming that the publications were privileged, were there disputed issues of material fact as to the existence of malice that should have been submitted to a jury. In short, was Sandpoint News-Bulletin's motion for summary judgment providently granted.

We will address the issue of privilege first, but before doing so, we will briefly delineate the relevant legal principles on which this case must be resolved.

Ever since *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) was decided, the Supreme Court has been grappling with the problem of reconciling the demands of the first amendment freedom of the press with the law of libel and invasion of privacy. *New York Times* and its progeny place a heavy burden on a libel plaintiff. If a communication is constitutionally privileged under *New York Times,* a plaintiff can recover only if he can prove malice on the part of the publisher, with malice being defined as knowledge of falsity or reckless disregard of truth. *New York Times Co. v. Sullivan, supra.* Although reckless disregard bears a superficial resemblance to gross negligence, the Supreme Court has interpreted it to mean much more. In *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), with only Justice Fortas dissenting, the Court reversed a judgment for the plaintiff because nothing in the record established that the defendant had a conscious awareness of probable falsity. In addition, the Court has replaced the "preponderance of evidence" standard of proof, generally applicable in civil cases, with the more demanding standard of "clear and convincing" evidence.

*Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 52, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). These same principles have also been applied to actions for invasion of privacy. *Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967).

The protection accorded the first amendment reached a high water mark in *Rosenbloom.* Not only did that decision give constitutionally privileged communications the benefit of a more demanding standard of proof, a plurality applied the *Times* privilege to a private individual's involvement in a matter of public or general concern. Prior to *Rosenbloom,* the privilege had been confined to publications concerning public officials or public figures. In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the tension that necessarily exists between the need for a robust press and the competing societal interest in preserving the integrity of an individual's reputation resulted in a retrenchment of the Court's interpretation of first amendment rights. The battleground was the threshold issue of privilege. The majority in *Gertz* rejected the contention of the plurality in *Rosenbloom* that publications involving matters of public and general concern enjoyed a constitutional privilege even when they involved private individuals. The issue was raised again in *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976) at which time the Court affirmed its holding in *Gertz,* stating explicitly that reports of judicial proceedings were not privileged *a priori.*

Appellant Bandelin cites *Gertz* and *Firestone* and argues on this basis that respondents' communications were not constitutionally privileged. We cannot agree. Although *Gertz* and *Firestone* narrowed the area of first amendment protection in libel and presumably in invasion of privacy actions, nothing in either case affected prior court decisions regarding privileged communications that involved public officials or public figures. The district court found that the reports of the Sandpoint News-Bulletin were privileged in that they were reports about a public figure. We agree.

■ The United States Supreme Court in *Gertz* said that the designation of a public figure may rest on two alternative bases:

"In some instances an individual may achieve such persuasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." 418 U.S. at 351, 94 S.Ct. at 3013.

A review of the record reveals that Bandelin was prominent in the local politics of Bonner County, had been a representative in the state legislature, was a leading attorney, and was well-known throughout the county. Counsel for Bandelin argues, however, that in recent years Bandelin's public role has subsided—that he has reverted to the "simple small-town lawyer he was before he gained notoriety." We concede that a public figure can revert back to the "lawful and unexciting life lead by the great bulk of the community." Prosser, Law of Torts, § 107 (1st ed. 1941). But it is far more common that a public figure will retain residual elements of his former status even when he returns to private life.

However, we do not affirm the district court's decision exclusively on the prominence that Bandelin enjoyed in the local community. We are sensitive to the consequences of being a public figure and we do not assume that a citizen's participation in community and professional affairs automatically renders him a public figure. We follow the approach of the Supreme Court in *Gertz*:

"It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation [or invasion of privacy]." 418 U.S. at 352, 94 S.Ct. at 3013.

In the present case, Bandelin as the guardian of the estate of Muriel I. Talbot was the center of the controversy that gave rise to the Sandpoint News-Bulletin's publications. The Sandpoint News-Bulletin initiated its coverage of the Talbot case when it became aware of the trial judge's criticism of Bandelin's handling of the Talbot guardianship. Under such circumstances, Bandelin cannot maintain that he is not a public figure and was just an attorney handling the probate affairs of a client. He was rather the court appointed guardian, a pivotal figure in the controversy regarding the accounting of the estate that gave rise to the defamation and invasion of privacy actions.

■ The fact that after a period of active involvement in the political and social affairs of Bonner County, Bandelin desired the personal anonymity of a private citizen, does not make him a private figure for first amendment purposes. Public figure status does not hinge upon an individual's preference in the matter. In most cases, a public figure will have become such by the active pursuit of the limelight; but the *Times* privilege is not precluded because an individual does not voluntarily pursue public acclaim. The privilege is based upon a value judgment that debate on public issues should be uninhibited. That judgment is applicable to both the individual who becomes embroiled in a public controversy through no effort of his own and the individual who actively generates controversy—both abdicate their anonymity.

Since the Sandpoint News-Bulletin's coverage of Bandelin's role in the Talbot case was constitutionally privileged, in order to recover on his libel and invasion of privacy action, Bandelin had to show that the publications were made with malice. We come then to the major issue which Bandelin raises on appeal—whether there were disputed issues of fact as to the existence of malice which should have been submitted to a jury.

■ The purpose of summary judgment is to avoid useless trials. When there are no genuine issues of material fact and a party is entitled to judgment as a matter of law, a trial court is justified in denying a trial on the merits. When there are issues of material fact, however, a trial is essen-

tial. In ruling on a motion for summary judgment a trial court's sole inquiry is whether such issues exist; a trial court should not resolve any existing factual issues.

These principles are so well engrained in the law that they require no citation. They apply to first amendment cases as well as less august legal questions. Although courts have said that serious problems will be created for free speech and free press if unwarranted law suits are allowed to proceed to trial, this solicitude for first amendment freedoms was not intended to abrogate the fundamental rules governing the administration of summary judgment. When first amendment rights are involved, courts should carefully distinguish between what are only formal allegations and what are substantial factual disputes. Whether summary judgment should be granted, however, is determined on the same basis— is there a genuine issue of material fact? In making that determination courts are required to view the evidence in the light most favorable to the party against whom the motion for summary judgment is made and to draw all inferences in his favor.

■ The first amendment is not without its protection in summary judgment proceedings, however. The manner in which a court must examine the evidence in determining whether there is a disputed issue of material fact is the same as in all other cases in which it is claimed that a case should not go to the jury. But the standard against which the evidence must be examined is that of *New York Times*. When a defendant's communications are constitutionally privileged, a plaintiff cannot prevail at trial unless he establishes malice with convincing clarity. This is the standard against which the court must examine the evidence on motion for summary judgment because this is the standard that determines materiality of disputed questions of fact. Unless there is evidence which if believed by a jury would establish malice clearly and convincingly, a defendant is entitled to summary judgment. Disputed issues of fact that if resolved in favor of the plaintiff would still fall short of establishing malice with convincing clarity are not material. *Bon Air Hotel, Inc. v. Time, Inc.*, 426 F.2d 858 (5th Cir. 1974); *Time, Inc. v. McLaney*, 406 F.2d 565 (5th Cir. 1969); *Guam Federation of Teachers v. Ysrael*, 492 F.2d 438 (9th Cir. 1974); *Cervantes v. Time, Inc.*, 464 F.2d 986 (8th Cir. 1972).

■ Applying these principles to the present case, we agree with the district court that summary judgment should have been granted. Even viewing the evidence most favorably to Bandelin and giving him the benefit of all proper inferences, there is no evidence that shows with convincing clarity that the Sandpoint News-Bulletin acted with malice. The only errors appearing in the report were two statements that Bandelin had been judged in contempt when his case had not yet come to trial. The Supreme Court of the United States found that a reporter's failure to differentiate between allegations in a complaint and proven fact is not sufficient to sustain a jury finding of actual malice. *Time, Inc. v. Pape*, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971). *But see Time, Inc. v. Firestone, supra.* Like Morgan Monroe, the reporter in this case, the reporter in *Pape* professed some familiarity with legal concepts. The Supreme Court based its conclusion on the fact that the alleged libel in *Pape* arose from a misinterpretation of an ambiguous document. The district court's order directing the prosecuting attorney of Bonner County to initiate contempt proceedings against Bandelin was equally ambiguous. Malice cannot be predicated exclusively on misstatements having their genesis in an ambiguous document.

■ Bandelin also relies on the tone of the articles to sustain his claim that summary judgment was improvidently granted. The articles were evocative. Phrases such as the "puzzling Talbot case," "rapid-fire developments," "shaken Bonner County legal community" blemish the articles. We do not applaud the Sandpoint News-Bulletin's journalism. It was unjustifiably sensational. However, the tone of the articles, even when considered with the other evi-

dence presented in the case, does not establish malice with convincing clarity. Malice is defined for first amendment purposes as knowledge of falsity or reckless disregard of truth. Its essence is a knowing state of mind on the part of the publisher. Although it is conceivable that the character and content of a publication could be so patently defamatory that a jury could infer a knowing state of mind on this basis alone, no case has so held. The argument was rejected on its facts in *New York Times Co. v. Sullivan, supra,* and *Washington Post Co. v. Keogh,* 125 U.S.App.D.C. 32, 365 F.2d 965 (1966). The alleged libel in the present case is much less serious than that in *New York Times* and *Washington Post.* Moreover, when both cases were decided, malice could still be proved by a mere preponderance of the evidence. We therefore decline to deviate from the results reached in *New York Times* and *Washington Post.*

Bandelin contends that the repetition of the news stories together with their misstatements and tone raise sufficient evidence of malice to justify submitting the question to a jury. The record establishes beyond factual dispute that the Talbot case was a continuing story—each of the articles was justified by a new development in the case. Morgan Monroe testified that standard journalism procedure is to summarize preceding developments in a continuing story, the assumption being that readers have not read the prior stories. Monroe's testimony is not challenged by any evidence to the contrary. We also take notice of the fact that the Sandpoint News Bulletin is a weekly paper. When a paper is not published daily, it may be more important to repeat what transpired previously so that readers will understand the latest developments in a story.

Bandelin has not introduced any other evidence of malice. What he has introduced even if accepted by a jury would not establish malice under the less demanding preponderance of evidence standard. It falls far short of establishing malice with convincing clarity.

Judgment affirmed. Costs to respondents.

McFADDEN, C. J., SHEPARD and BAKES, JJ., and SCOGGIN, D. J., retired, concur.