Richard W. MICHAUD

v.

**INHABITANTS OF the TOWN OF LIVERMORE FALLS and M. Gaylord Boutilier.**

Supreme Judicial Court of Maine.

Jan. 17, 1978.

Smith & Stein by Gordon E. Stein (orally), Hallowell, for plaintiff.

Locke, Campbell & Chapman by Frank G. Chapman (orally), Augusta, for defendants.

Before McKUSICK, C. J., and POMEROY, WERNICK and GODFREY, JJ.

McKUSICK, Chief Justice.

The plaintiff, Richard W. Michaud, at that time Director of the State Bureau of Maine's Elderly, brought this single libel action against the Town of Livermore Falls and its Town Manager, M. Gaylord Boutilier, and the Town of Jay and the Chairman of its Board of Selectmen, Douglas J. Wiggins. Michaud grounded his libel suit upon letters written by Boutilier and Wiggins to Governor Longley complaining about Michaud's alleged conduct at a public meeting in Livermore Falls on July 16, 1975.

After trial in the Kennebec County Superior Court, the jury returned a verdict for defendants Wiggins and the Town of Jay, and a verdict in favor of plaintiff Michaud against Boutilier and the Town of Livermore Falls, but awarding no damages to Michaud.

Defendants Boutilier and the Town of Livermore Falls have appealed the judgment entered against them, even though for zero damages, and plaintiff Michaud has cross-appealed. The judgment in favor of the other defendants below has become final upon Michaud's failure to appeal.

We sustain the appeal of defendants Boutilier and the Town of Livermore Falls and direct the entry of judgment for them notwithstanding the verdict. We deny plaintiff Michaud's cross-appeal.

The circumstances leading up to the Boutilier and Wiggins letters related to efforts to coordinate and consolidate publicly funded transportation, including that for the elderly, in Androscoggin, Franklin, and Oxford counties. In 1975, at least three such separate transportation services with duplicated routes and costs served the area. These were threatened with termination within a year or so unless a less costly consolidated program was instituted. Plaintiff Michaud was interested in the matter as the director of a State agency whose approval was necessary for use in the consolidated program of any State and federal funds earmarked for the elderly. Defendants Wiggins and Boutilier were involved both as representatives of towns which would be asked to furnish "seed money" for any consolidated program and as chairman and vice chairman, respectively, of the Franklin County Transportation Services (FCTS), one of the proposed instruments for providing the needed consolidated transportation services. At a February 1975 meeting of a sizeable number of the persons concerned with the transportation problem, including plaintiff Michaud and

the individual defendants, a unanimous vote approved merger of all transportation services in FCTS.

On July 16, 1975, a public meeting was held at the Livermore Falls town hall to permit citizens in the three counties to voice opinions on FCTS and competing plans for addressing the transportation needs of the area. Just prior to the meeting, newspaper accounts indicated that certain groups of the elderly had changed their position to one of opposition to FCTS; and early in the meeting Michaud surprised the defendants by strongly supporting that opposition. Exactly what plaintiff Michaud said and did at the meeting was the subject of considerable dispute at the trial of this libel action, but without any doubt he and the defendants engaged in heated interchanges. A contemporary newspaper account reported that the "meeting terminated with a number of accusations of 'power plays' and 'personality comments'."

Five days later Boutilier sent to Governor Longley the letter which Michaud claims constitutes actionable defamation against him. A copy of that letter is Appendix A to this opinion. On July 23 Wiggins wrote to Governor Longley, similarly criticizing the plaintiff's conduct at the meeting.[1]

In December 1975 Michaud sued the two town officials, and their respective towns,[2] for libel, seeking $50,000 in damages. Af-

ter extensive pre-trial discovery and motions, the case was tried to a jury on November 22–24 and 30, 1976, resulting in the verdict and judgment of liability, but no damages, against Boutilier and his employer, the Town of Livermore Falls. On their appeal, their principal argument is that the evidence before the jury was not constitutionally adequate to sustain its finding of liability against them. On his cross-appeal, Michaud seeks a new trial on the issue of damages only, arguing principally that he was entitled to a jury instruction on libel *per se* and punitive damages. We agree with the position of the defendants and, since we direct entry of judgment for the defendants, we do not reach the damages issues raised by the cross-appeal.

Although this case, because of the public officials involved and because of media interest in the substantive law,[3] has apparently become something of a *cause celebre*, it in fact presents no novel legal questions. To decide this dispute between these parties, we are not called upon to chart any new boundaries between the First Amendment rights of a speaker or writer and the common law rights of a plaintiff to recover damages for actionable defamation. The law that we are here bound to follow is laid out by *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its Supreme Court progeny.[4] On this

1. The Wiggins letter in part stated:
 "Mr. Richard Michaud, Bureau of Maine's Elderly, obviously attended, not just to support Project Independence's position, but also to demean and ridicule anyone and everyone present that did not share his views.
 "My opinion of Mr. Michaud's actions are my own, but I can assure you that many citizens who were at the meeting share my feelings wholeheartedly. One individual summed it up best when he stated that *any* person holding a position as responsible as Mr. Michaud's who would spend an entire meeting laughing, audibly, at everyone who held a viewpoint different from his own, should be thrown out of State Government.
 "His actions and manner in this instance, did not help the public image of state government and I am certain that you, as the pinnacle of State Government would want to be made aware of the situation."
 Except as the Wiggins letter is part of the total fact situation of this case, the jury verdict in

Wiggins' favor, with no appeal from the resulting judgment, eliminates occasion for further discussing that letter or Michaud's suit against Wiggins and the Town of Jay on the basis of it.

2. The Town of Livermore Falls concedes that it is liable by *respondeat superior* if its agent Boutilier is held liable in this action. In their answer the defendants also asserted a defense of municipal immunity, a contention they have since abandoned.

3. The Maine Press Association sought unsuccessfully to file a brief *amicus curiae*.

4. The impact of the First Amendment decisions on state law of defamation has been commented upon in the recently published third volume of the *Restatement (Second) of Torts* (1977) as follows:
 "A different kind of change, so substantial as to be almost a transformation, has also come about, with the holding in *New York Times Co. v. Sullivan*, (1964) 376 U.S. 254 [84 S.Ct.

point at least the disputants now before us are in agreement.

■ There can be no doubt that a letter written by a town official to the Governor of the State complaining about the official action of the chief of an important State bureau calls into play those considerations of free debate of public issues emphasized in *New York Times*.

"Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan, supra*, 376 U.S. at 270, 84 S.Ct. at 721, 11 L.Ed.2d at 701. The protections afforded by the *New York Times* rule to discussions of a public official's conduct are not limited to the media, *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); and again we find no disagreement between the present adversaries.

Thus, in deciding this case, we are denied the exhilaration of setting up new guideposts on the frontier of First Amendment law. We have merely the workaday task of examining the voluminous Superior Court record to determine whether the jury's verdict, finding liability on the part of Boutilier, though assessing no damages against him, can stand.

710, 11 L.Ed.2d 682], that the law of defamation comes under the control of the First Amendment to the Constitution and its prohibition against any law abridging the freedom of speech or of the press. Applied to judicial decisions under the common law as well as to legislative provisions and extended to state law through incorporation into the Fourteenth Amendment, this clause of the First Amendment is being used by the United States Supreme Court to rewrite many aspects of the law of defamation." *Id.* at 151–52.
This opinion need concern itself only with the law relating to *liability* for defamation on the facts of this case and the changes worked in that law by the Supreme Court decisions. The nature and extent of the changes undoubtedly

■ *New York Times* teaches us that Michaud, as a public official, must—in order to make out his claim of actionable defamation—prove, not only that the defamatory statements in Boutilier's letter to the Governor [5] were in fact false, but that also Boutilier made the statements with knowledge that they were false or with reckless disregard of whether or not they were false. 376 U.S. at 279–80, 84 S.Ct. at 725, 11 L.Ed.2d at 706. The *New York Times* rule thus focuses upon the defendant's state of mind in specific regard to the truth or falsity of his statements about the public official. The Supreme Court has used the term "actual malice" to refer to that state of mind which destroys the constitutional protection otherwise accorded a defamatory statement about a public officer or public figure. "Actual malice" is so used, however, in a specialized, rather than a literal sense; it refers to the publisher's knowledge or reckless disregard of falsity. The term "actual malice," so used as shorthand for "knowledge or reckless disregard," is to be distinguished from malice in the sense of ill-will or animosity. *See Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 82, 88 S.Ct. 197, 198, 19 L.Ed.2d 248, 250 (1967). Animosity or even a desire to injure the other party does not alone constitute the "actual malice" that takes the statement outside the First Amendment protections, though it may with other evidence support an inference of "knowledge or reckless disregard" of falsity. *Cf. Garrison v. Louisiana, supra; Restatement (Second) of Torts* § 580A, Comment d at 218 (1977).

worked also in the law of *damages* in defamation actions by those decisions, see *id.* at 153, is beyond the necessary scope of the present opinion. Although it does not involve a public official or a public figure as plaintiff, *Jacron Sales Co., Inc. v. Sindorf*, 276 Md. 580, 350 A.2d 688 (1976), contains one of the most comprehensive analyses of the Supreme Court cases and their effect on state law of defamation that we have found.

5. Although Boutilier's letter obviously contained expressions of the author's opinion of Michaud, it also made conclusory statements of fact, namely, that "a town official . . . has recently been insulted, patronized, and declared not competent to organize public services, as well as being castigated in public" by Michaud.

As the Supreme Court has said: " 'Reckless disregard,' it is true, cannot be fully encompassed in one infallible definition. Inevitably its outer limits will be marked out through case-by-case adjudication . . . ." *St. Amant v. Thompson,* 390 U.S. 727, 730, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968). *St. Amant* went on to say:

"These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be *sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.*" (Emphasis added) *Id.,* 390 U.S. at 731, 88 S.Ct. at 1325, 20 L.Ed.2d at 267.

In addition to *St. Amant,* numerous other Supreme Court decisions tell us that the Constitution requires that the public official, to recover, must prove the defendant's knowledge or reckless disregard by a high standard of evidence. *See, e. g., Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 55, 91 S.Ct. 1811, 1825, 29 L.Ed.2d 296, 318 (1971) ("none of the proofs . . . satisfies the constitutional standard with the convincing clarity necessary to raise a jury question"); *Garrison v. Louisiana, supra,* 379 U.S. at 74, 85 S.Ct. at 216, 13 L.Ed.2d at 133 (only those statements made "with the high degree of awareness of their probable falsity . . . may be the subject of either civil or criminal sanctions"); *New York Times Co. v. Sullivan, supra,* 376 U.S. at 285–86, 84 S.Ct. at 729, 11 L.Ed.2d at 710 (evidence in the record lacks the "convincing clarity which the constitutional standard demands"). *See also Restatement (Second) of Torts* § 580A, Comment f at 220 (1977).

 Before this court the defendants contend that the plaintiff's evidence of knowledge or reckless disregard on Boutilier's part failed to come up to the *New York Times* "convincing clarity" standard; that the case should never have been permitted to go to the jury; and that since the trial court erroneously denied their motion for judgment notwithstanding the verdict, the Law Court should exercise its authority under Rule 50(c), M.R.Civ.P., itself to direct the entry of such judgment. Since the defendants properly preserved this claim of error for our present review on appeal,[6] we must examine the evidence before the jury to determine whether it was sufficient to support the jury verdict in favor of the plaintiff. Without serious contrary argument by the defendants, the plaintiff asserts that the scope of appellate review of sufficiency of the evidence is that ordinarily applied in reviewing a denial of a motion for judgment notwithstanding the verdict; in other words, that in determining whether the evidence was sufficient to prove "knowledge or reckless disregard" with convincing clarity, this court should look at the evidence, including every justifiable inference, in the light most favorable to the plaintiff in whose favor the verdict was rendered. *See* 1 Field, McKusick & Wroth, *Maine Civil Practice* § 50.2, n. 12 (2d ed. 1970). Whether, in a case such as this involving First Amendment rights,[7] the plaintiff is right in his limited view of the scope of appellate review turns out, however, to make no difference in the outcome of this appeal. Even if we thus limit the scope of our appellate review of the evidence, we conclude that the jury verdict cannot stand. In this record, even when

---

**6.** Although the defendants denominated their motion at the end of all the evidence a motion to dismiss, one ground stated therefor was that "there has been no showing on the part of the Plaintiff of any malice with respect to any Defendant." This motion thus was the functional equivalent of a motion for a directed verdict, a prerequisite for a subsequent motion for judgment notwithstanding the verdict and for attacking on appeal the sufficiency of the evidence, Rule 50(b), (c), M.R.Civ.P. On these facts, it would be unreasonably technical to bar the defendants here from pressing their entitle-

ment to a judgment notwithstanding the verdict, and plaintiff's counsel makes no such contention.

**7.** For a broader scope of appellate review, see *New York Times Co. v. Sullivan, supra,* 376 U.S. at 285, 84 S.Ct. at 729, 11 L.Ed.2d at 709 ("an independent examination of the whole record"); *Rosenbloom v. Metromedia, Inc., supra,* 403 U.S. at 54, 91 S.Ct. at 1825, 29 L.Ed.2d at 318 (plurality opinion) ("an independent constitutional judgment on the facts of the case"; *de novo* review").

viewed most favorably to the plaintiff, the jury could not find proof with convincing clarity[8] that Boutilier wrote his remarks critical of Michaud with knowledge or reckless disregard of their falsity.

The plaintiff's case consisted first of his own testimony refuting each allegation in the Boutilier and Wiggins letters. Then five other persons who had attended the July 16, 1975 meeting testified in substantial corroboration of Michaud's testimony. Each witness was asked to describe the conduct of the plaintiff and the defendants at the meeting, and each testified that the plaintiff's conduct and statements, as observed by them, had not been as alleged in the letter. In their turn, Boutilier and Wiggins, along with five other witnesses who also were present at the July 16 meeting, testified to their perceptions of what happened at the meeting in substantial contradiction to the testimony of the plaintiff's witnesses.

Standing alone, the plaintiff's evidence, if believed by the jury, was sufficient to establish that the accusations in the letters were in fact false. The critical question then becomes whether that evidence marshalled by the plaintiff satisfies the "knowledge or reckless disregard" test of *New York Times; i. e.,* whether that evidence proved with convincing clarity that Boutilier was guilty of at least reckless disregard, irrespective of the assumed objective *falsity* of the remarks. The latter inquiry leads us without hesitation to a negative answer. None of the plaintiff's witnesses, including the plaintiff himself, testified either directly to Boutilier's state of mind or to facts

sufficient to enable the jury to infer "knowledge or reckless disregard."[9] In fact, the testimony of the plaintiff's own witnesses establishes the probability that the meeting led to high emotions and resulted in widely varying perceptions and interpretations of the participants' conduct, depending upon each viewer's degree and position of involvement. On this record there is no evidence, and certainly none of convincing clarity, that the Boutilier letter, although possibly biased and exaggerated, was not an *honest* communication relating the author's own interpretation of the plaintiff's conduct.

Although to some extent Boutilier's mental state might be inferred from the fact of falsehood (assuming the plaintiff's evidence was believed by the jury) and from any "ill-will" of the defendant toward Michaud, those inferences, standing alone, do not satisfy proof of convincing clarity. It patently is difficult to infer "reckless disregard" from a jury's finding of falsity here, in view of the close balance between the conflicting testimony on that issue;[10] and there is no evidence that the defendant bore any ill-will toward Michaud independent of that resulting from the July 16 confrontation.[11] Nor are we impressed that any justifiable inference of "reckless disregard" can be drawn, as here argued by plaintiff's counsel, from the facts that Boutilier sent off his letter without checking it with others and addressed it directly to the Chief Executive of the State, rather than to some subordinate agency concerned specifically with transportation matters. In the present circumstances, where Boutilier him-

**8.** The "convincing clarity" standard of proof required by *New York Times* to be applied at the trial level by the factfinder is apparently a matter separate and independent from the scope of appellate review of factfindings. Compare Comments f and g to *Restatement (Second) of Torts* § 580A at 220 (1977).

**9.** Contrast *Cantrell v. Forest City Publishing Co.,* 419 U.S. 245, 253, 95 S.Ct. 465, 470–71, 42 L.Ed.2d 419, 427 (1974), where there was ample evidence of the defendant's use of "calculated falsehoods."

**10.** Contrast *Mahnke v. Northwest Publications, Inc.,* 280 Minn. 328, 160 N.W.2d 1 (1968), cited by the plaintiff, where the publisher, though

having no firsthand knowledge of the facts, issued a plainly defamatory and indisputably false article without checking.

**11.** Contrast *Greenbelt Cooperative Publishing Ass'n, Inc.,* 253 Md. 324, 363, 252 A.2d 755, 777 (1969), *rev'd,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), cited by the plaintiff, where, despite extensive independent evidence of the publisher's prior animosity toward the defamed person and continuing desire to injure his reputation and standing, the United States Supreme Court reversed, holding there was insufficient evidence of "reckless disregard" to support the verdict for the plaintiff.

self had firsthand knowledge of the meeting about which he was writing, his failure to check his letter with others [12] is equally consistent with both Boutilier's confidence in its truth and his disregard of its falsity; and the nature of Boutilier's complaint against Michaud related to Boutilier's adverse view of the latter's capability for his State job, a matter of gubernatorial concern, and not to the specifics of transportation in the three-county area. On such shaky inferences a jury would not be justified in finding that Boutilier made the statements "with the high degree of awareness of their probable falsity" constitutionally required under the Supreme Court's decisions.

In sum, our search of the record (even when viewed in the light most favorable to the plaintiff) does not turn up any evidence of Boutilier's "knowledge or reckless disregard" of the "convincing clarity which the constitutional standard demands." *New York Times Co. v. Sullivan, supra,* 376 U.S. at 285–86, 84 S.Ct. at 729, 11 L.Ed.2d at 710. The trial court should have granted judgment to the defendants notwithstanding the verdict.

On his cross-appeal, plaintiff seeks affirmance in part and reversal in part. He would have this court remand for a new trial on damages only. Since we are directing the entry of judgment for the defendants notwithstanding the verdict, we have no occasion to address the issues relating to damages raised by the plaintiff.

■ We have examined the other claims of error asserted by the plaintiff on his cross-appeal to see whether they are of a nature to require this court to choose the new trial alternative of Rule 50(c), M.R. Civ.P., rather than judgment n. o. v. The only one of the plaintiff's claims which merits discussion for that purpose is his assertion that the trial court erred in denying plaintiff's timely motion for sequestration of nonparty witnesses. Rule 615, M.R. Evid., "makes exclusion of witnesses from the courtroom while other witnesses are testifying wholly discretionary, reversible only for abuse." Field & Murray, *Maine*

*Evidence,* Advisers' Note to Rule 615, at 166 (1976). In the absence of any indication that the failure to sequester prejudiced the plaintiff, the trial court did not abuse that discretion. By no stretch could it be said that plaintiff's failure to make out a sufficient case of "knowledge or reckless disregard" to get to the jury was attributable to the trial court's refusal to sequester witnesses.

The entry must be:

Defendants' appeal sustained;

Judgment for the plaintiff set aside;

Remanded to the Superior Court with direction to enter judgment for the defendants notwithstanding the verdict; and

Plaintiff's cross-appeal denied.

POMEROY, WERNICK and GODFREY, JJ., concur.

ARCHIBALD, DELAHANTY and NICHOLS, JJ., did not sit.

### APPENDIX A

### OFFICE OF TOWN MANAGER

### LIVERMORE FALLS, MAINE

July 21, 1975

Governor James Longley
State House
Augusta, Maine 04330

Dear Governor Longley,

As a town official who has recently been insulted, patronized, and declared not competent to organize public services, as well as being castigated in public by one of your department heads, Richard Michaud, Bureau of Maine's Elderly, I wish to officially express my concern that the State of Maine should employ someone of Mr. Michaud's arrogance in a public position.

Yes, I'm a town manager, obviously looked down upon by a pseudo-intellectual bureaucrat. However, before returning to Maine I was a senior executive in four multi-national, billion dollar asset corporations. I have had the distinct pleasure of

---

**12.** See n. 10 above.

dealing with many of the world's finest financial minds, and enjoyed their respect.

Mr. Michaud, however, has set himself up as being able to pass judgment on me and my fellow town officials who have spent the past six months establishing a corporate vehicle to provide transportation services in Franklin County and Livermore Falls. This gets very involved from here, but suffice to say, this corporation would affect Project Independence, thus touching in Mr. Michaud's sacrosanct bailiwick.

Governor, to be treated with contempt by this official, is a serious matter. My fellow town managers from Wilton, Farmington, and Rangeley, and selectmen from Jay, Weld, and New Sharon also were involved and their efforts were treated by Mr. Michaud as being absolutely useless. We can run our communities but have nothing to offer Mr. Michaud. This kind of attitude from State agencies does not set well with Town officials. I am sure you wish to be made aware of a situation like this. Should you or your staff want more details please call me and they will be readily provided.

Very truly yours,

M. Gaylord Boutilier

M. Gaylord Boutilier
Town Manager
Livermore Falls

MGB:cm