Paul C. TUCCI

v.

GUY GANNETT PUBLISHING CO., et al.[1]

Supreme Judicial Court of Maine.

Argued June 14, 1983.

Decided Aug. 8, 1983.

---

1. The other defendants are Jean Gannett Hawley, John K. Murphy, Nancy B. Perry, John Menario and the City of Portland.

Sewall Mittell & Hefferan, Robert Edmond Mittel (orally), Portland, for plaintiff.

Preti, Flaherty & Beliveau, Jonathan S. Piper (orally), Portland, for Guy Gannett Pub. Co.

Kelly, Remmel & Zimmerman, Leland Chisholm (orally), Portland, for John E. Menario.

Bernstein, Shur, Sawyer & Nelson, F. Paul Frinsko (orally), Portland, for defendants.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, VIOLETTE and WATHEN, JJ.

VIOLETTE, Justice.

On January 23, 1980, plaintiff Paul Tucci brought a libel action (CV–80–89) against Guy Gannett Publishing Co.,[2] Jean Gannett Hawley, John K. Murphy, Nancy Perry and John Menario for statements appearing in a series of articles and editorials published in the "Portland Press Herald" and the "Evening Express" in late September of 1979. He subsequently filed an action (CV–80–493) on April 22, 1980, against the above named defendants, Thomas F. Valleau and the City of Portland, seeking damages for invasion of privacy arising from those same articles and editorials. On November 20, 1980, the Superior Court (Cumberland County) granted the City of Portland's motion to dismiss and Thomas Valleau's motion for summary judgment in CV–80–493. Tucci moved that same day to amend his complaint in CV–80–493 to add a new cause of action against the City of Portland. The Superior Court has never ruled on that motion.[3]

After the completion of extensive discovery, all the remaining defendants moved for summary judgment in both cases. On January 7, 1983, the Superior Court granted summary judgment in favor of all these defendants in both actions on the ground that plaintiff could not prove by "clear and convincing evidence" that the allegedly libelous statements were published with "actual malice", as contemplated by *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Plaintiff appeals from the entry of judgment in both cases, claiming that, on the record in this case, there is a genuine issue of fact with respect to the issue of "actual malice" on the part of the defendants.[4] We deny the appeal and affirm the judgments of the Superior Court.

## I. Facts

The facts relevant to the issue of "actual malice" will be discussed in more detail in connection with that question. A brief outline, however, of the facts precipitating the instant dispute are as follows. On August 6, 1970, Robert Curley and David Dutton were monitoring a police promotional examination administered under the auspices of the Civil Service Commission of the City of Portland. During the exam, they purportedly observed Tucci copying answers from another person on several occasions. Instead of taking action at that time, they sent a letter the next day to the Civil Service Commission alleging that Tucci had cheated on the exam. In the letter, they explained the basis for their charge and why they did not take action while administering the exam. A copy of this letter was also sent to defendant John Menario who was then the City Manager of Portland and who acted in a supervisory capacity over Curley and Dutton in their respective ca-

---

2. From hereon, a reference to "Gannett" collectively refers to Guy Gannett Publishing Co., Jean Gannett Hawley, John K. Murphy, and Nancy B. Perry.

3. After plaintiff filed his notice of appeal, the parties stipulated that the trial justice denied this motion. On appeal plaintiff claims the trial justice erroneously denied the motion to amend. For reasons to be set forth below in Section III, we will treat his argument as if he

is contending that he is entitled to a ruling on his motion to amend.

4. Plaintiff addresses only the propriety of entering summary judgment on the libel action. He concedes that he cannot maintain his invasion of privacy action (CV–80–493) if he cannot maintain the libel action. *See Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 490, 95 S.Ct. 1029, 1043–44, 43 L.Ed.2d 328 (1975).

pacities as Personnel Director and Assistant Personnel Director.

Curley and Dutton personally notified Menario about the situation on August 11, 1970. At that time, he suggested that they prepare a comparison of the answer sheets of the persons involved. This comparison revealed that, out of a possible 100 questions, both answer sheets had 47 identical correct answers and 27 identical incorrect answers. As Menario later wrote, "This does not mean by way of illustration that both officers answered incorrectly for example question number 8 but that both answered incorrectly question number 8 by choosing the same wrong alternative." Menario's subsequent participation in the matter involved several discussions with Tucci, Tucci's attorney and various members of the Civil Service Commission. The matter ended for the time being when the Civil Service Commission made its decision to take no action against Tucci, or it is at least unclear whether it took any action. Menario thereupon decided to not allow the Personnel Department thereafter to assist the Civil Service Commission in administering or monitoring exams.

On September 21, 1970, after the above events had transpired, Menario prepared a memo (the "Menario Memo") for his files, detailing his perception of the events from the time he was notified by Curley and Dutton of the alleged cheating until the Commission's decision. According to Menario's deposition, he sent a copy of this memo to Curley. He prepared the memo just in case there were inquiries as to why the Personnel Department no longer assisted the Civil Service Commission in the administering of examinations. The memo made clear that Menario "was convinced beyond doubt that cheating took place." It also made clear that Menario disliked Tucci and that he disapproved of the Commission's decision.

For approximately nine years this matter lay dormant until Nancy Perry, a reporter for Guy Gannett Publishing Co., uncovered it. During the fall and summer of 1979,

Perry was covering the meetings of a special committee which was investigating Portland's Civil Service Commission. On September 11, 1979, during a meeting of this committee, a member of the Civil Service Commission stated that the Commission had previously covered up the fact that a police officer had cheated on a promotional exam. Perry began investigating that charge the next day.

During the ensuing days, she contacted several people and eventually acquired a copy of the Menario memo from Robert Curley. Sometime prior to her acquisition of the memo, Curley received Menario's concurrence that it was alright to give it to her. Based on the Menario memo and her investigative efforts, Perry wrote an article entitled "Cheating Charge Disclosed" which appeared in the "Evening Express" on September 19, 1980. The article raised questions not only about Tucci's behavior, but also about the handling of the matter by the Civil Service Commission. The article quoted from the Menario memo and it also contained comments by Tucci, Curley and John McDonough (a member of the Civil Service Commission in 1970). Several articles and editorials subsequently appeared in the "Portland Press Herald" and the "Evening Express" essentially repeating the theme of the first article.

II. *Was Summary Judgment Properly Granted on the Issue of "Actual Malice"?*

Having been a police officer when the alleged cheating incident occurred and a City Councilor when the articles and editorials appeared in the newspapers, Tucci concedes that he is a public official within the meaning of *New York Times,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686. Therefore, to succeed in this action, he must prove not only that the allegedly defamatory statements were in fact false, but that defendants made the statements with " 'actual malice'—that is, with knowledge that [they were] false or with reckless disregard of whether [they were] false or not." *New*

*York Times,* 376 U.S. at 279–80, 84 S.Ct. at 726; *see also Michaud v. Inhabitants of the Town of Livermore Falls,* 381 A.2d 1110, 1113 (Me.1978). Plaintiff's burden is a heavy one; actual malice must be proved with "convincing clarity". *New York Times,* 376 U.S. at 285–86, 84 S.Ct. at 729; *Michaud,* 381 A.2d at 1114. The *New York Times* standard of actual malice has a specialized inquiry which focuses on defendant's attitude towards the truth or falsity of the publication rather than on defendant's ill will or animosity against plaintiff. *Nader v. de Toledano,* 408 A.2d 31, 40 (D.C. 1979), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980); *Michaud,* 381 A.2d at 1113. Where, as here, the plaintiff claims that defendants published with reckless disregard of the truth, he must show by evidence of "convincing clarity" that these defendants "in fact entertained serious doubts as to the truth of [the] publication." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); *see also Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964) ("only those false statements made with the high degree of awareness of their probable falsity ... may be the subject of either civil or criminal sanctions").

Before addressing the propriety of entering summary judgment for the defendants on the issue of actual malice, we must next set forth the applicable law relative to summary judgment. M.R.Civ.P. 56(c) provides in relevant part:

> Judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law.

On a motion for summary judgment, the trial court must not resolve any issues of fact; rather, it must determine whether there is any issue of material fact from which a jury could find for the non-moving party. *Hammond v. Maine Central R.R.,* 390 A.2d 502, 504 (Me.1978); *Millett v. Dumais,* 365 A.2d 1038, 1042 (Me.1976); *see also Time, Inc. v. McLaney,* 406 F.2d 565, 573 (5th Cir.), *cert. denied,* 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969). "[Summary judgment] should only be granted when 'the facts before the court so conclusively preclude ... [a party's] recovery' that a judgment in favor of the other party is the only possible result." *Wallingford v. Butcher,* 413 A.2d 162, 165 (Me.1980).

■ Where, as here, a defendant in a libel action moves for summary judgment on the issue of actual malice, the motion should be granted only, if upon viewing the evidence most favorably to the plaintiff, there exists no genuine issue of fact from which a jury could reasonably find with "convincing clarity" that defendants acted with actual malice. *Yiamouyiannis v. Consumer Union of the United States, Inc.,* 619 F.2d 932, 940 (2d Cir.), *cert. denied,* 449 U.S. 839, 101 S.Ct. 117, 66 L.Ed.2d 46 (1980); *Nader,* 408 A.2d at 42; *Bandelin v. Pietsch,* 98 Idaho 337, 341, 563 P.2d 395, 399 (1977); *National Association of Government Employees, Inc. v. Central Broadcasting Corp.,* 379 Mass. 220, 231, 396 N.E.2d 996, 1003 (1979), *cert. denied,* 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980); *MacGuire v. Harriscope Broadcasting Co.,* 612 P.2d 830, 832 (Wyo.1980). Although the facts are viewed against the "convincing clarity" standard, this does not work a change in traditional summary judgment procedure. The standard (convincing clarity) against which the evidence is examined is dictated by *New York Times,* while the manner of examining the evidence in the light most favorable to the non-moving party is the same as in all determinations of motions for summary judgment.[5] *Guam Federation of*

---

5. In this sense, a motion for summary judgment is theoretically the same as that for a directed verdict. *See 6 Moore's Federal Practice* ¶ 56.04[2], at 74–76 (2d ed. 1983); 10 C. Wright & Miller, *Federal Practice and Proce-*

*dure* § 2713.1, at 613–20 (2d ed. 1983). Where, as in this case, the record is fully developed by depositions and affidavits, a defendant "may successfully move for summary judgment when it is clear that he would be entitled to a

*Teachers, Local 1581, A.F.T. v. Ysrael,* 492 F.2d 438, 441 (9th Cir.), *cert. denied,* 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974); *Nader,* 408 A.2d at 42; *Bandelin,* 98 Idaho at 341, 563 P.2d at 399.

■ In light of those principles, we now review the presiding justice's granting of summary judgment in favor of the defendants on the issue of actual malice. In doing so, we do not accord deference to the presiding justice's determination. Rather, we must independently review whether the evidence which is either undisputed or, if disputed, viewed in the light most favorable to plaintiff raises a genuine issue of fact from which a jury could reasonably find that actual malice was established with convincing clarity. *See MacGuire,* 612 P.2d at 833.

The underlying material facts in this case are essentially undisputed. Tucci does not claim that defendants knew in fact the publications were false. Rather, he argues that, on this record, there is a genuine issue of fact as to whether the defendants published with reckless disregard of the truth because "there [were] obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant,* 390 U.S. at 732, 88 S.Ct. at 1326. Tucci principally contends that an inference of malice could be drawn from Menario's expressed dislike of Tucci; Menario's expressed disapproval with the Civil Service Commission's handling of the matter; and an inference that Curley disliked Tucci. Because different circumstances attend the publishings by defendant Menario and defendant Gannett, we will analyze them separately.

(A) *Defendant Menario.*

Menario allegedly libeled Tucci when the Menario memo appeared in the newspapers. Tucci has not presented any evidence nor made any claim that events occurring after Menario originally wrote the memo could have caused Menario to entertain serious doubts as to the truthfulness of the statements in the Menario memo. Therefore, we must focus on the circumstances surrounding the drafting of the memo in 1970 to determine whether a jury could find that Menario published the memo with actual malice.

At his deposition, Menario had little recollection of the events occurring in 1970 apart from what was written in the Menario memo. The Menario memo in conjunction with Curley's deposition reveal the following undisputed facts. On the day Menario returned to work from a week vacation, Curley and Dutton gave Menario a copy of a letter that they had sent to the Civil Service Commission, alleging that Tucci had cheated while taking the promotional exam. The letter detailed their grounds for the charge and why they did not take immediate action. At this point, Menario discussed the charges with them and suggested that they attempt to confirm the charges by comparing Tucci's answers with those of Karl Learned, the man from whom Tucci allegedly cheated. Dutton performed the comparison and later reported the results to Menario. The comparison showed that, out of 100 questions, both answer sheets had 47 identical correct answers and 27 questions were answered by the same incorrect alternative. Menario later wrote in the Menario memo that "having seen the analysis of the two score cards I was convinced beyond doubt that cheating took place".

■ Actual malice cannot be inferred solely from Menario's dislike of Tucci. *Michaud,* 381 A.2d at 1113. There must be evidence tending to show with convincing clarity that Menario entertained serious doubts as to the truth of the matter asserted. *id.* at 1113–14. Even viewing the evidence in the light most favorable to the plaintiff, the added fact that Menario knew Curley disliked Tucci would not support a jury finding of actual malice on the record in this case. Although the failure to inves-

directed verdict at trial if plaintiff presented nothing more than was before the court at the hearing on the motion." 2 Field, McKusick & Wroth, *Maine Civil Practice* § 56.2a, at 36 (2d ed. 1970).

tigate allegations received from a source known to be hostile to the subject of the publication may support a finding of actual malice,[6] this is not a case in which Menario failed to investigate the veracity of the allegations.

■ Here there were two sources of information. Even if Curley was biased, there is nothing in the record to show that Dutton was unreliable or biased. Menario discussed the allegations of cheating with both sources and he read the letter sent by both of them to the Civil Service Commission, alleging that cheating had occurred. He did not rest on their representations alone; he asked them to prepare a comparison of the tests. This task was performed by Dutton, the reliable or at least untainted source. Tucci does not challenge the results of the test comparison. Rather, he claims that Menario did an incomplete investigation by not having the test analyzed by expert statisticians. In the context of this case, Tucci takes nothing by this claim. On its face, the results of the test comparison seem suspicious such that the results would not have been an obvious reason for Menario to entertain doubts as to the truth of the allegations. Although he may have been biased, there is simply no evidence on this record from which a jury could infer with convincing clarity that Menario published the Menario memo with reckless disregard of the truth or falsity of the matter. Accordingly, we conclude that the presiding justice properly granted summary judgment in favor of defendant Menario.

### (B) *Defendant Gannett*

It is undisputed that, prior to publishing the allegedly defamatory matter, Gannett undertook the following investigation. After learning of the alleged cheating incident at the meeting of the special committee which was investigating Portland's Civil Service Commission, Nancy Perry began her investigation in earnest by contacting Curley. By the time she finished speaking with him, she knew that Tucci had been involved in an alleged cheating incident; that Menario had prepared a memo detailing the incident; and that Curley had a copy of the Menario memo. Because Curley was in Boston at this time, she contacted Menario to obtain a copy of the memo and to inquire as to his recollections of the matter. He told her that he vaguely remembered the incident, but he did not remember drafting the Menario memo. They did not discuss details because of his lack of memory. He did tell her that she could possibly find it in the attic of City Hall, if it existed.

Continuing her investigation, she received permission to search for the Menario memo in the attic of City Hall, but her search yielded nothing. After descending from the attic, she went to the office of the City's Corporation Counsel and received permission from him to search the files of the Civil Service Commission. Although she did not find that Menario memo, she observed some documents pertaining to a police promotional exam taken on August 6, 1970. She took notes concerning these documents; however, she did not realize their significance until later when she obtained the Menario memo.

Having been thus far unsuccessful in her attempt to find the Menario memo, she called Curley and asked him if he would provide her with a copy of it. He consented and they agreed to meet that Friday when he returned to Cape Elizabeth, Maine. Curley met with Perry that Saturday (September 15, 1979), instead of Friday, at her office in Portland and he gave her a copy of the Menario memo. After reading the Menario memo she realized the significance of the documents observed by her at City Hall. Her notes referred to a comparison of Tucci's test with that of Karl Learned, the man

---

**6.** *See Fisher v. Larsen,* 138 Cal.App.3d 627, 639–40, 188 Cal.Rptr. 216, 225–26 (1982); *Widener v. Pacific Gas & Electric Co.,* 75 Cal. App.3d 415, 435, 142 Cal.Rptr. 304, 315 (1977); *see also Curtis Publishing Co. v. Butts,* 388 U.S. 130, 156–57, 87 S.Ct. 1975, 1992–93, 18 L.Ed.2d 1094 (1967).

from whom Tucci allegedly cheated, as did the Menario memo. Before leaving her office that day, Curley once again told her that he was convinced that Tucci had cheated on the examination.

On September 18, 1979, Perry contacted John McDonough, a member of the Civil Service Commission in 1970, and he told her that he remembered allegations of cheating being lodged against Tucci. He further told her that the charges were dropped because it was Tucci's word against that of the monitors and that the Personnel Department should have taken immediate action at the examination. The next day she culminated her research by speaking with Tucci. Although he denied having cheated on the examination, he did not deny that accusations of cheating had been made against him.

Tucci does not dispute that Gannett conducted its investigation as described by Nancy Perry's affidavit. However, he does claim that the investigation was inadequate in the circumstances and, therefore, the jury could infer actual malice in the *New York Times* sense. Specifically, in light of Menario's expressed dislike of Tucci, his disapproval of the Civil Service Commission's handling of the matter and the fact that this was not "hot news", he claims that the record raises an issue of fact with respect to actual malice because: (1) Perry did not question Curley in any great detail; (2) she never questioned Dutton; (3) she never asked Curley whether he disliked Tucci; and (4) she never asked Menario about the dislike he expressed for Tucci in the Menario memo. We disagree.

Actual malice may be inferred when an investigation is grossly inadequate in the circumstances. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 156–57, 87 S.Ct. 1975, 1992–93, 18 L.Ed.2d 1094 (1967); *Vandenburg v. Newsweek, Inc.,* 507 F.2d 1024, 1026 (5th Cir.1975). Especially when the matter is not "hot news", a more thorough investigation is expected. *Schultz v. Reader's Digest Association,* 468 F.Supp. 551, 564 (E.D. Mich.1979). However, even if there is an error that might have been prevented by a more thorough investigation, courts have held the evidence insufficient to support a jury verdict of actual malice where the defendant had no doubts about the accuracy of the information and the sources appeared reliable. *Ryan v. Brooks,* 634 F.2d 726, 733–34 (4th Cir.1980); *Dickey v. CBS Inc.,* 583 F.2d 1221, 1227–28 (3rd Cir.1978); *Hotchner v. Castillo-Puche,* 551 F.2d 910, 912–14 (2d Cir.1977); *Vandenburg,* 507 F.2d at 1026. We do not think that a jury could reasonably find or infer that the investigation in this case was grossly inadequate or that it indicated a reckless disregard for the truth.

The primary source for the publications was the Menario memo. Gannett, however, did not publish the articles and editorials solely on the basis of the Menario memo. Before publishing the articles and editorials, Gannett undertook a fairly extensive investigation. Perry spoke with Curley, who was one of the two proctors at the examination administered on August 6, 1970. She had no apparent reason to doubt his word and she did not know whether he harbored any ill will against Tucci. He told her now, as he had told Menario in 1970, that he had observed Tucci cheating.

She also uncovered further information to corroborate the accuracy of the Menario memo. The documents she observed and noted at City Hall corroborated that part of the memo which referred to a comparison to Tucci's answer sheet with that of the man from whom he allegedly cheated. The Menario memo accurately reported those results and, as mentioned previously, those results do not serve to undercut Menario's opinion, as expressed in the memo, that he was convinced cheating took place. Her conversation with McDonough corroborated that cheating charges had been lodged against Tucci and that the Civil Service Commission criticized the Personnel Department for not taking immediate action at the examination. Perry also contacted Tucci and, although he denied cheating, he did not deny that cheating charges had been

brought against him. The lead article fairly portrayed Tucci's denial of the charges. She did contact Menario during the investigation; he, however, was unhelpful because he vaguely remembered the incident. Finally, Nancy Perry averred both in her affidavit and at her deposition that she bore no ill will or malice to Tucci.

▮▮▮▮ At most, Perry may have negligently investigated the matter by failing to ask Curley whether he disliked Tucci, by failing to ask Menario about the dislike for Tucci he expressed in the Menario memo, and by failing to contact Dutton. A jury could not, however, reasonably conclude that the investigation was grossly inadequate in the circumstances. Negligent investigative reporting alone does not constitute actual malice, there must be a showing that the publisher entertained serious doubts as to the truth of the matter published. *Garrison,* 379 U.S. at 79, 85 S.Ct. at 218; *New York Times,* 376 U.S. at 288, 84 S.Ct. at 730; *Capital-Gazette Newspapers, Inc. v. Stack,* 293 Md. 528, 542, 445 A.2d 1038, 1045 (1982). The fact that Menario, through the Menario memo, expressed both dislike of Tucci and disapproval of the Civil Service Commission's handling of the matter does not create an inference of actual malice in light of Gannett's independent verification as to the accuracy of other aspects of the memo.[7] On the basis of this record, a jury could only reasonably conclude that Gannett acted on a reasonable belief that the statements were substantially correct. *See New York Times,* 376 U.S. at 286, 84 S.Ct. at 729; *Capital-Gazette Newspapers, Inc.,* 293 Md. at 540, 445 A.2d at 1045. We, therefore, must conclude that there was insufficient evidence from which a jury could reasonably find or infer with *"convincing clarity"* that Gannett entertained serious doubts about the truth of the

publications. Accordingly, the presiding justice did not err when he granted summary judgment in Gannett's favor.

▮▮▮▮ In upholding the presiding justice's granting of summary judgment, we are aware that courts should proceed with caution when state of mind is at issue. *See Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). That is particularly true if the motion is submitted only upon affidavits. That does not mean, as plaintiff suggests, that summary judgment is always inappropriate when a party's state of mind is at issue. In the instant case, all the major characters had been deposed prior to the motion for summary judgment. The motion was submitted on those depositions, affidavits of Perry and Menario, and all of the relevant documents. In those circumstances, a plaintiff cannot avoid summary judgment merely by asserting that the cause of action puts in issue defendant's state of mind. *See Jones v. Borden Co.,* 430 F.2d 568, 574 (5th Cir.1970); *Miles v. Dickson,* 40 F.R.D. 386, 389 (M.D.Ala.1966), *aff'd in part, rev'd in part,* 387 F.2d 716 (5th Cir.1967). "There must be some indication that [plaintiff] can produce the requisite quantum of evidence to enable him to reach the jury with his claim." *Hahn v. Sargent,* 523 F.2d 461, 468 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). Plaintiff has failed to do so in this case.

### III. *The Motion to Amend*

Finally, Tucci attempts to belatedly resurrect a motion to amend the complaint in CV–80–493. On November 20, 1980, the Superior Court granted the City's motion to dismiss in CV–80–493. On this same date, plaintiff moved to amend the complaint to add a new cause of action against the City of Portland. This motion was continued

---

7. *Cf. Curtis Publishing Co.,* 388 U.S. at 156–57, 87 S.Ct. at 1992–93 (publisher knew informant had been placed on probation on bad check charges and yet undertook no substantial investigation to verify his affidavit); *Fisher v. Larsen,* 138 Cal.App.3d 627, 188 Cal.Rptr. 216, 225–26 (1982) (defendants relied on document

which they knew was prepared by a potentially biased informant without making any effort to verify the veracity of the document); *Widener,* 75 Cal.App.3d at 435, 142 Cal.Rptr. at 315 (corporate executives knew charges were unusual and yet conducted no investigation of the informant's allegations).

pending the taking of the depositions of Robert Curley and Nancy Perry. Curley's deposition was filed with the Superior Court on December 11, 1980; Perry's deposition was taken the next day and filed in Superior Court on June 11, 1981. Defendants Gannett and Menario subsequently moved for summary judgment and this motion was heard on December 3, 1982. Summary judgment was granted for those defendants on January 7, 1983. No action was ever taken on the motion to amend until after Tucci appealed from the granting of summary judgment in CV–80–89 and CV–80–493. After Tucci filed his notice of appeal, the parties stipulated that the Superior Court order granting summary judgment "shall be interpreted to include a denial of plaintiff's then outstanding motion to amend his complaint to assert a claim against the City of Portland." [8]

 We simply cannot accept the stipulation by the parties. There is no indication from the order granting summary judgment that the presiding justice ruled on the motion. Furthermore, it is clear that the motion was never heard nor briefed. We certainly cannot review for abuse of discretion by the presiding justice when it is clear that he never had an opportunity to exercise his discretion. In any event, on the basis of this record, we hold that, as a matter of law, Tucci waived or abandoned a ruling on the motion to amend.

In the past, this Court has made clear that a party may be deemed to have waived or abandoned a motion by failing to proceed with the motion or by taking action inconsistent with the motion. *Cunningham v. Kittery Planning Board*, 400 A.2d 1070, 1075–76 (Me.1979); *Jones v. Suhre*, 345 A.2d 515, 518 (Me.1975). The party seeking a ruling on a motion has the burden to

proceed with the motion. *Jones*, 345 A.2d at 518. In the instant case, the motion to amend was initially continued until the depositions of Curley and Perry were taken. These depositions were taken by December 12, 1980, and filed in Superior Court by June 11, 1980. Yet, Tucci never sought to schedule a hearing on the motion at any time after the taking of the depositions and over two years passed between the taking of the depositions and the entry of judgment on January 7, 1983, for defendants Menario and Gannett. Moreover, Tucci should have taken some action on the motion to amend his complaint in CV–80–493 before the hearing on the motions for summary judgment which, if granted, would result in the dismissal of the complaint. In these circumstances, we must rule that Tucci has waived a ruling on his motion to amend.

The entry is:

Judgments affirmed.

All concurring.

---

8. Presumably, Tucci entered into this stipulation because of his concern that the judgment in CV–80–493 was not appealable unless this motion had been ruled upon. That, however, is not true. M.R.Civ.P. 54(b) would not bar an appeal because, as relevant here, it applies only when judgment is entered with respect to fewer than all the parties. Because the City had previously been dismissed, it would not have

been a party for purposes of M.R.Civ.P. 54(b) until the motion to amend was granted. Furthermore, even if there had been a "final judgment" problem, the parties could not stipulate that the trial court ruled on the motion to amend so as to confer jurisdiction on this court. *See Rush v. County of Aroostook,* 447 A.2d 478, 479 n. 2 (Me.1982); *Young v. Sturdy Furniture Co.,* 441 A.2d 320, 321 (Me.1982).