STATE OF MAINE
CUMBERLAND, ss

BUSINESS AND CONSUMER COURT
Location: Portland
Docket No.: BCD-CV-10-42

*AMH -CUM- 2/23/2012*

MICHAEL A. KEENAN, TROY E.
OSGOOD, MICHAEL G. CYR, and
CATHY A. LONDON,

          Plaintiffs,

      v.

INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE
WORKERS, R. THOMAS
BUFFENBARGER, and LYNN D.
TUCKER,

          Defendants

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants International Association of Machinists and Aerospace Workers (IAMAW or GL), R. Thomas Buffenbarger, and Lynn D. Tucker have moved for summary judgment on all three counts of Plaintiffs' complaint: libel per se (Count I), defamation (Count II), and false light invasion of privacy (Count III). Plaintiffs Michael A. Keenan, Troy E. Osgood, Michael G. Cyr, and Cathy A. London, all former elected officials of IAMAW Local Lodge S6, have opposed the motion, and the court has heard oral argument.

At oral argument, the Plaintiffs acknowledged that they are public figures to whom the First Amendment actual malice standard, as articulated in *New York Times Co. v. Sullivan,* 376 U.S. 254 (1964), applies. They also confirmed that their claims are limited to alleged defamatory statements contained in three letters: 1) the March 12, 2008, letter sent from Defendant Tucker to Defendant Buffenbarger; 2) the March 17, 2008, letter sent from Mr.

1

Buffenbarger to the membership of Local Lodge S6; and 3) the August 12, 2008, letter sent from Mr. Buffenbarger to the Local Lodge S6 membership. With that framework in mind, the court turns to the facts as presented by the parties.

*FACTUAL BACKGROUND*

IAMAW is an international labor organization that represents some 730,000 members in the United States and Canada. (Supp. S.M.F. ¶ 1; Opp. S.M.F. ¶ 1.) Defendant Buffenbarger is the International President of IAMAW. (Supp. S.M.F. ¶ 1; Opp. S.M.F. ¶ 1.) IAMAW's members belong to hundreds of local lodges, including Local Lodge S6 ("Local S6"), which represents approximately 3,400 employees at Bath Iron Works (BIW) in Bath and a smaller number of BIW workers in Alabama. (Supp. S.M.F. ¶ 2; Opp. S.M.F. ¶ 2.)

Local S6 is affiliated with District Lodge 4; both are part of IAMAW's Eastern Territory, which is headed by Defendant Tucker. (Supp. S.M.F. ¶ 3; Opp. S.M.F. ¶ 3.) Paul Shemanski was a GL representative reporting to Tucker until April 1, 2008, when he was promoted. (Supp. S.M.F. ¶ 3; Opp. S.M.F. ¶ 3.)

In October 2007, Local S6 held an election for local union officers. (Supp. S.M.F. ¶ 6; Opp. S.M.F. ¶ 6.) Three of the four Plaintiffs, President Keenan, Vice President Osgood, and Chief Steward Cyr, were re-elected. (Supp. S.M.F. ¶ 6; Opp. S.M.F. ¶ 6.) London was a candidate for the office of trustee, but she did not win in the October 2007 election. (Supp. S.M.F. ¶ 6; Opp. S.M.F. ¶ 6.) Shortly after the election, Buffenbarger received more than half a dozen protests from Local S6 members regarding the conduct of the election, including a protest by Plaintiff Cathy London. (Supp. S.M.F. ¶ 8; Opp. S.M.F. ¶ 8.) The protests alleged, among other things, that the integrity of the secret ballots was not maintained and the ballot boxes had not been secured. (Supp. S.M.F. ¶ 8; Opp. S.M.F. ¶ 8.)

Buffenbarger assigned Shemanski to investigate the election. (Supp. S.M.F. ¶ 9; Opp. S.M.F. ¶ 9.)[1] Shemanski's investigation revealed numerous problems with the election, which he reported to Buffenbarger. (Supp. S.M.F. ¶ 10; Opp. S.M.F. ¶ 10.)[2] During his investigation, Shemanski also received complaints from Local S6 members about a backlog of grievances and improper bonuses paid to union officers, both of which he reported to Tucker. (Supp. S.M.F. ¶ 12; Opp. S.M.F. ¶ 12.)[3] Based on Shemanski's report, Buffenbarger determined that the October election had to be rerun. (Supp. S.M.F. ¶ 11; Opp. S.M.F. ¶ 11.)[4] Tucker sent Shemanski and GL representative Bill Rudis to oversee the new election in January 2008. (Supp. S.M.F. ¶ 13; Opp. S.M.F. ¶ 13.) In addition, Shemanski was tasked with investigating other allegations of wrongdoing at Local S6 received during his first investigation. (Supp. S.M.F. ¶ 14; Opp. S.M.F. ¶ 14.) In the new election, which occurred on February 12, 2008, Plaintiffs Keenan, Cyr, and Osgood were again elected, and London was elected Trustee. (Supp. S.M.F. ¶ 13; Opp. S.M.F. ¶ 13.)

The parties agree that Shemanski's investigation of wrongdoing at Local S6 found that there was a backlog of over 1000 pending grievances. (Supp. S.M.F. ¶ 15; Opp. S.M.F. ¶ 15.)[5] The parties dispute the amount of grievances that were time barred and whose fault the

[1] Plaintiffs deny the portion of the Defendants' statement of material fact that indicates Buffenbarger followed established IAMAW procedures regarding the treatment of election protests as unsupported by the cited affidavit, but does not otherwise address the balance of the statement of material fact. Plaintiffs' denial does include allegations, supported by affidavit, that Buffenbarger's "established procedure" is to retaliate against his critics through the pretense of an investigation that reveals planted pornography on union computers. (Opp. S.M.F. ¶ 9.)
[2] Plaintiffs qualify this statement of material fact to note that union member Glenn Burroughs, who ran the October 2007 election, had run the elections at the Local S6 for twenty years without problems. (Opp. S.M.F. ¶

[2] Plaintiffs qualify this statement of material fact to note that union member Glenn Burroughs, who ran the October 2007 election, had run the elections at the Local S6 for twenty years without problems. (Opp. S.M.F. ¶ 10.)
[3] Plaintiffs qualify this statement and assert that Shemanski only spoke with opponents of Keenan and the other Plaintiffs. (Opp. S.M.F. ¶ 12.)
[4] Plaintiffs qualify this statement to assert that Buffenbarger's motivation for rerunning the election was a pretext because he did not like the outcome of the election. (Opp. S.M.F. ¶ 11.)
[5] Defendants assert that there had been a backlog for "a long time" is not entirely supported by the record citation. The witness states that he's been with the union "a long time," not that the backlog has been pending a long time. (Osgood Tr. 488.) The witness does indicate, however, that a backlog of about 1000 pending grievances is typical for Local S6. (Osgood Tr. 488.)

3

backlog was; IAMAW asserts that 46 grievances were time barred, but Plaintiffs assert that only 2 were time barred and that the backlog was due to the District Lodge, not Local S6.[6] (Supp. S.M.F. ¶¶ 15, 17; Opp. S.M.F. ¶¶ 15, 17.)

Shemanski's investigation also revealed that Local S6 was paying hundreds of thousands of dollars a year to BIW to compensate for the time Local S6 officials spent on union business during their work shifts at BIW. (Supp. S.M.F. ¶ 21; Opp. S.M.F. ¶ 21.) The parties dispute whether there was a system in place for confirming the legitimacy of these payments, but for a union the size of Local S6, $500,000 of lost time compensation paid in a single year (2007) is a substantial amount. (Supp. S.M.F. ¶ 21; Opp. S.M.F. 21; Supp. S.M.F. ¶ 22.)[7]

The parties agree, as Shemanski found in his investigation, that since 2002, $26,000 worth of clothing and other merchandise purchased by Local S6 bearing "union label" insignia could not be accounted for.[8] (Supp. S.M.F. ¶¶ 24-25; Opp. S.M.F. ¶ 25.) Plaintiffs assert, however, that the discrepancy is not due to any wrongdoing on their part, but due to their inability to take a proper inventory leading up to 2002, when Plaintiffs took over the leadership at the Local S6. (Opp. S.M.F. ¶¶ 24, 25.)[9]

Shemanski also received complaints from members that union computers were being misused, both for viewing pornography and for creating campaign materials for the election. (Supp. S.M.F. ¶ 26; Opp. S.M.F. ¶ 26.)[10] Over an extended period of time, members of Local S6 repeatedly observed officials, including Plaintiff Osgood, viewing pornography on Local

---

[6] In addition, Defendants assert that one Local S6 member filed a charge with the NLRB against Local S6 based on a time-barred grievance, but Plaintiffs assert the allegation was brought against the District Lodge not Local S6. (Supp. S.M.F. ¶ 16; Opp. S.M.F. ¶ 16.) The parties also dispute the efficacy of Local S6's grievance tracking procedure. (Supp. S.M.F. ¶ 18; Opp. S.M.F. ¶ 18.)

[7] Plaintiffs did not respond to Supp. S.M.F. ¶ 22 at all in their opposing statement of material facts. Defendants' statement is supported by the record and thus is deemed admitted. *See* M.R. Civ. P. 56(h).

[8] There appears to have been a Department of Labor investigation into the union-brand merchandise issue, in which Local S6 was cleared of any wrongdoing. (Supp. S.M.F. ¶ 24; Opp. S.M.F. ¶¶ 24-25.)

[9] Not all of Plaintiffs qualification is supported by the record citations provided, nor do they refer to the appropriate paragraphs in the affidavits, but the court does not deem the deficiency material to the motion.

[10] Plaintiffs qualify this statement with an assertion that Shemanski was biased against Keenan. (Opp. S.M.F. ¶ 26.)

computers, primarily on paid time. (Supp. S.M.F. ¶ 27; Opp. S.M.F. ¶ 27.)[11] The viewing of pornography was essentially common knowledge and was openly discussed at a Local S6 Executive Board meeting in late 2006 or early 2007. (Supp. S.M.F. ¶ 27; Opp. S.M.F. ¶ 27.) The parties dispute how many members complained to Keenan about the viewing of pornography on Local S6 computers. (Supp. S.M.F. ¶ 27; Opp. S.M.F. ¶ 27.)

In mid-February of 2008, Brian Collis, a technician from IAMAW's information technology (IT) department, examined Local S6's computers and discovered large amounts of pornography,[12] at least some of which had been accessed during union business hours. (Supp. S.M.F. ¶ 28.) Plaintiffs assert that Collis overstated the amount of pornography on the computers, asserting that portions of the pornography were found in "lost files," i.e. files that are no longer available to the user. (Opp. S.M.F. ¶ 28.) Some of the images that Collis discovered were of young people in suggestive poses. (Supp. S.M.F. ¶ 29.) Plaintiffs contend, however, that what the IAMAW later implied in the March 17, 2008 Buffenbarger letter were possible child pornography images came from a computer in Alabama, a month after the trusteeship was instituted, and that the image found in February 2008 was an innocent photo of children in a tub taken by one of the union members. (Opp. S.M.F. ¶ 29; A.S.M.F. ¶¶ 103-04.)

In mid-February, 2008, Shemanski and Rudis recommended to Tucker to place Local S6 into trusteeship.[13] (Supp. S.M.F. ¶ 30; Opp. S.M.F. ¶ 30.) Upon Tucker's review of the facts, Tucker wrote a letter to Buffenbarger on March 12, 2008, recommending the imposition of a trusteeship. (Supp. S.M.F. ¶ 32.) Plaintiffs, however, assert that Tucker decided to impose the

---

[11] Plaintiffs' only qualification to this statement of material fact is that the existence of pornography was only brought to Keenan's attention once, and he promptly responded. (Opp. S.M. F. ¶ 27.)

[12] The pornography consisted of hundreds of pages of approximately three to six pornographic images per page. (Supp. S.M.F. ¶ 28.)

[13] Plaintiffs qualify this statement by questioning the accuracy of the basis for Shemanski's recommendation, which was financial impropriety and mismanagement, including time-barred grievances and the discovery of pornography. (Supp. S.M.F. ¶ 30; Opp. S.M.F. ¶ 30.) Rudis based his recommendation on local officials' refusal to cooperate with IAMAW guidelines regarding collective bargaining and resistance to paying bills related to rerun the election. (Supp. S.M.F. ¶ 30.)

trusteeship after a lunch with Keenan in Portland on February 17, 2008, at which Keenan refused to contribute to the MNPL Education Fund.[14]  (Opp. S.M.F. ¶ 32.)

The March 12 letter is the first alleged defamatory statement by Defendants regarding the Plaintiffs.  The March 12 letter[15] stated that Tucker was "in receipt of the following credible information which indicates that" Local S6:

1.  Is engaging in widespread and chronic financial malpractices, many of which have resulted in ongoing investigation by the U.S. Department of Labor, and include, but are not limited to:

    a.  Failing to maintain appropriate accounting, inventory, and controls over the purchase of tens of thousands of dollars of union-label merchandise;

    b.  Failing to provide proper authorization and support for the payment of bonuses to Lodge employees;

    c.  Failing to explain the legitimate union purpose of various computer and technology purchases, or to maintain proper authorizations, inventory systems and controls for merchandise and equipment;

    d.  Failing to provide specific authorization, explanation of union purpose, and approval for tens of thousands of lost-time compensation;

    e.  Failing to cease certain practices involving BIW payments after repeatedly being advised that such payments and benefits were unlawful, and accruing benefits with no accountability;

    f.  Failing to satisfy Lodge financial obligations the American Arbitration Association and to local community businesses on which the Lodge depends for support and assistance[;]

    g.  Failing to abide by IAM election policies, procedures, and guidelines, which resulted in an election protest being filed, and re-run election being ordered, and the accrual of thousands of dollars in addition costs the Lodge and its members.

---

[14] The MNPL Education Fund uses donations to educate members on political issues. (Supp. S.M.F. ¶ 59; Opp. S.M.F. ¶ 59.)  Plaintiffs assert that the MNPL Education Fund donates money to politicians and political causes IAMAW supports. (A.S.M.F. ¶ 78.)

[15] For unknown reasons, neither side has presented the alleged defamatory statements *verbatim* in their statements of material facts, calling into question whether the word-for-word statements are even properly before the court. *See Mortg. Elec. Registration Sys., Inc. v. Saunders*, 2010 ME 79, ¶ 25, 2 A.3d 289 ("facts not set forth in the parties' statements of material facts are not part of the summary judgment record").  Because, however, the parties agreed at oral argument that the content of these letters was not subject to dispute, the court includes the substance of each of the letters.

2. [Local S6] is also endangering the good and welfare of the organization and its membership by:

   a. Permitting the rampant viewing and accessing of substantial amounts of pornography and pornographic materials on union computers during union-paid time by various Lodge officials;

   b. Failing to secure Lodge property, including computers and confidential grievance documents, on BIW property;

   c. Allowing an enormous backlog of grievances and case pending arbitration to accumulate by negligently failing to process grievances and sort out those lacking in merit, and allowing time limits on numerous grievances to lapse;

   d. Refusing to comply with procedures and preparations for the upcoming contract negotiations with Bath Iron Works ("BIW") that are specifically designed to ensure the maximum membership input and involvement;

   e. Undermining community support for the members as they headed into contract negotiations by failing to pay debts owed to local merchants.

(Buffenbarger Depo. Exh. 7 at 1-2.) When Buffenbarger received the recommendation, he requested a complete set of documents regarding the reasons for the trusteeship, which were reviewed by IAMAW's legal department. (Supp. S.M.F. ¶ 33.) After the review, Buffenbarger agreed there were serious violations that justified imposing a trusteeship under IAMAW's constitution. (Supp. S.M.F. ¶ 33.) Plaintiffs assert, however that Buffenbarger did not investigate, but took Tucker's decision at face value and began setting in motion the machinery for implementing the trusteeship. (Opp. S.M.F. ¶ 33.)[16]

On March 17, 2008, Buffenbarger sent letters to the 3,400 members and officers of Local S6 informing them of the trusteeship and the reasons for its imposition. (Supp. S.M.F. ¶ 37; Opp. S.M.F. ¶ 37.) Rudis was appointed temporary trustee. (Supp. S.M.F. ¶ 37; Opp.

---

[16] Plaintiffs cite pages 98-104 of Buffenbarger's deposition, which are not included in the summary judgment record. (See Opp. S.M.F. ¶ 33.)

7

S.M.F. ¶ 37.)  Twenty-one officials (including all the Plaintiffs) of Local S6 were suspended from their union positions.[17]  (Supp. S.M.F. ¶ 37; Opp. S.M.F. ¶ 37.)

The March 17, 2008, letter is the second alleged defamatory statement.  The letter identified the following "serious problems" at Local S6:

- In recent weeks, we received complaints of vast amounts of **pornography** being viewed on Lodge computers, both at the worksite and at the Lodge office, while individuals have been on paid union time.  An analysis of Lodge computers has confirmed the accuracy of these complaints.  It is conduct unbecoming union members and officials, it exposes the Lodge to serious legal liability, and it brings dishonor upon the entire IAM.  One computer contained photos of young children in suggestive poses.  The appropriate law enforcement authorities are being notified about these materials.

- For some months, **U.S. Department of Labor investigators** have been reviewing what they believe to be serious lapses in Lodge financial controls.  Among the issues we understand are being examined are:

  o The Lodge's failure to maintain appropriate accounting, inventory, and controls over the purchase, sale, and storage of **union-label merchandise**.  One report indicates that the amounts in question and accounted for may exceed **$100,000**.

  o The Lodge's failure to promptly cease certain practices involving **BIW payments to Lodge officers** after repeatedly being advised that such payments were unlawful;

  o The lodge's payment of an employment bonus for which there was not proper authorization.

- It also appears that **tens of thousands of dollars** are being paid out monthly for 'lost time' that is not properly documented or authorized, and **thousands of dollars** worth of computer equipment has been purchased without proper explanations of the legitimate union need for the item, proper authorization, and virtually no controls as to where the equipment is being used an by whom.

- Local Lodge **debts**, including more than **$11,000** due to the **American Arbitration Association** and outstanding bills from **local, community merchants**, have been allowed to accrue jeopardizing the union's standing in the community and its ability to represent members who have contract disputes.

---

[17] At the outset, this number was closer to 60.  Rudis, however, determined that the shop stewards could continue their work, leaving 21 suspended officials. (Supp. S.M.F. ¶ 37; Opp. S.M.F. ¶ 37.)

- The Lodge has allowed an enormous **backlog of grievances** and cases pending arbitration to accumulate by negligently failing to process grievances, to sort our those lacking in merit, and allowing the time limits on numerous grievances to lapse.

- Lodge Leaders failed to follow IAM election policies and procedures prior to the Lodge's elections last Fall. This resulted in a **protest** being filed with the IAM, and **a required re-run election**. Had IAM procedures been followed, the Lodge could have saved about **$10,000**.

(Buffenbarger Depo. Exh. 9 at 1-2 (emphasis in original); *see* A.S.M.F. ¶ 96; Reply S.M.F. ¶ 96.) Plaintiffs characterize these allegations as "vile" and "outrageous" and as against them personally, but Defendants qualify the statement to note that the letter does not name the Plaintiffs personally and does not use those descriptors. (A.S.M.F. ¶ 96; Reply S.M.F. ¶ 96.)

A hearing before a trial committee of non-Local S6 IAMAW members was held between April 14, 2008, and April 17, 2008, to determine whether the trusteeship should be continued or dissolved. (Supp. S.M.F. ¶ 41; Opp. S.M.F. ¶ 41.) At the hearing, Rudis introduced exhibits containing pornography contained on the computers, audit reports and financial records, and a list of grievances that BIW's records showed were time-barred. (Supp. S.M.F. ¶ 43; Opp. S.M.F. ¶ 43.) The trial committee found that four problems warranted the continuation of the trusteeship: an inventory shortfall of nearly $27,000 in union-label merchandise; the lack of a system to verify payments made for union "lost time"; the presence of pornography on Lodge computers; and the extreme backlog of grievances. (Supp. S.M.F. ¶¶ 49-52; Opp. S.M.F. ¶¶ 49-52.)[18] The trial committee recommended the continuation of the trusteeship. (Supp. S.M.F. ¶ 53; Opp. S.M.F. ¶ 53.)

On August 12, 2008, Buffenbarger sent a letter to the Local S6 members informing them that he had accepted the recommendation of trusteeship from the committee. (Supp.

---

[18] Plaintiffs qualify these statements to note that there was no finding of wrongdoing by any of the particular Plaintiffs and there was no finding regarding child pornography or that any Plaintiff was viewing pornography on union time or equipment. (Opp. S.M.F. ¶¶ 49-52; *see* A.S.M.F. ¶ 115.)

S.M.F. ¶ 54; Opp. S.M.F. ¶ 54.) This letter constitutes the third and final instance of defamation alleged by the Plaintiffs. Specifically, Plaintiffs take issue with this statement in the letter: "the clear evidence of widespread viewing of pornography on computers at the Local Lodge," (Buffenbarger letter dated August 12, 2008, at 3), which they allege was widely disseminated in the local press. (A.S.M.F. ¶¶ 119-20.)

Defendants assert, in a series of statements of material facts, that Tucker and Buffenbarger believed the contents of each of their letters, had no doubts of their accuracy, and reviewed thoroughly the information IAMAW staff provided. (Supp. S.M.F. ¶¶ 63-65.)[19] Further, the sources utilized during the investigation had proven reliable and accurate in the past, and neither Tucker nor Buffenbarger were aware of any reason to think the sources were biased or that any facts called into question the truth of the statements in their letters. (Supp. S.M.F. ¶¶ 63-65.)

Plaintiffs initiated the present suit on March 8, 2010, in Sagadahoc County Superior Court, alleging three counts: slander per se (Count I), defamation (Count II), and false light (Count III). The case was accepted for transfer to the Business and Consumer Court on July 14, 2010. Defendants moved for summary judgment on November 8, 2011.

*DISCUSSION*

I. CAUSES OF ACTION

A claim of defamation consists of: 1) a false and defamatory statement; 2) an unprivileged publication to a third party; 3) fault amounting at least to negligence on the part of the publisher; and 4) either actionability of the statement irrespective of special harm or the

---

[19] Plaintiffs deny each statement, without record citations, and assert that Tucker decided to impose the trusteeship after his meeting with Keenan on February 17, 2008. (Opp. S.M.F. ¶¶ 63-65.) Because each of Defendants' statements of material fact are supported by record citations, the statements are deemed admitted. *See* M.R. Civ. P. 56(h).

10

existence of special harm caused by the publication. *See Lester v. Powers*, 596 A.2d 65, 69 (Me. 1991).

"Slander per se refers to spoken defamatory statements that relate to a profession, occupation or official station in which the plaintiff was employed. Malice is implied as a matter of law in such cases, and the claimant may recover compensatory damages without proving special damages." *Cookson v. Brewer Sch. Dep't*, 2009 ME 57, ¶ 27, 974 A.2d 276 (quotation marks omitted).

"In Maine, a false light claim of invasion of privacy is a common law, not a statutory, cause of action." *Dempsey v. National Enquirer, Inc.*, 687 F. Supp. 692, 693 (D. Me. 1988); *accord Nelson v. Me. Times*, 373 A.2d 1221, 1223-24 (Me. 1977). "[T]he right of privacy is invaded, in relevant part, by publicity that places another person in a false light which would be highly offensive to a reasonable person, when the publisher had knowledge of or acted in reckless disregard as to the falsity of the publication and the false light in which the individual would be placed."[20] *Dempsey*, 687 F. Supp. at 693; *accord* RESTATEMENT (SECOND) OF TORTS § 652A (1977).

Each cause of action requires proof that the defendant published a false and defamatory statement of and concerning the plaintiff. "A statement is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Rippett v. Bemis*, 672 A.2d 82, 86 (Me. 1996) (quotation marks omitted). In addition, "in order for written or spoken language, otherwise defamatory, to be actionable, it must be 'of or concerning the plaintiff.'" *See Hudson v. Guy Gannett Broadcasting Co.*, 521 A.2d 714, 716 (Me. 1987).

---

[20] Because Plaintiffs have limited their case to only written defamatory statements in the three subject letters, dropping all claims related to subsequent newspaper articles and the trustee hearing, it could be argued that the two latter causes of action no longer apply to the circumstances of this case. Because, however, the court decides this case on other grounds, there is no need to address that issue.

11

The parties agree that the Plaintiffs are public figures for the purposes of this case and that each of their three causes of action is subject to the actual malice standard.[21] "Therefore, to succeed in this action," Plaintiffs "must prove not only that the allegedly defamatory statements were in fact false, but that defendants made the statements with 'actual malice -- that is, with knowledge that [they were] false or with reckless disregard of whether [they were] false or not.'" *Tucci v. Guy Gannett Publg. Co.*, 464 A.2d 161, 165 (Me. 1983) (quoting *New York Times Co.*, 376 U.S. at 279-80). Actual malice is not "an evil intent or a motive arising from spite or ill will." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991). The actual malice standard requires more of a plaintiff.

As the Law Court has explained:

Plaintiff's burden is a heavy one; actual malice must be proved with "convincing clarity." The *New York Times* standard of actual malice has a specialized inquiry which focuses on defendant's attitude towards the truth or falsity of the publication rather than on defendant's ill will or animosity against plaintiff. . . .

. . . .

Where, as here, a defendant in a [defamation] action moves for summary judgment on the issue of actual malice, the motion should be granted only, if upon viewing the evidence most favorably to the plaintiff, there exists no genuine issue of fact from which a jury could reasonably find with "convincing clarity" that defendants acted with actual malice. Although the facts are viewed against the "convincing clarity" standard, this does not work a change in traditional summary judgment procedure. The standard (convincing clarity) against which the evidence is examined is dictated by *New York Times*, while the manner of examining the evidence in the light most favorable to the non-moving party is the same as in all determinations of motions for summary judgment.

*Tucci*, 464 A.2d at 166 (quotation marks and citations omitted); *see also Ballard v. Wagner*, 2005 ME 86, ¶ 15, 877 A.2d 1083 (explaining that a public figure must show actual malice by clear and convincing evidence).

---

[21] *See Miller v. Transamerican Press Inc.*, 621 F.2d 721, 725 (5th Cir. 1980) (declaring the treasurer of the Teamsters union to be a public figure as "relates to his official duties"); *Dunlop-McCullen v. Rogers*, 2002 U.S. Dist. LEXIS 3202, at *23 (S.D.N.Y. Feb. 21, 2002) ("Courts have generally held union members to be public figures for purposes of union business where their position is one of prominence or where their activities place them in a controversy that invites scrutiny.").

II.     STANDARD OF REVIEW

In order for a party to obtain summary judgment, there must be no genuine dispute as to any material fact and the party is entitled to judgment as a matter of law. *See* M.R. Civ. P. 56(c). For purposes of summary judgment, a "material fact is one having the potential to affect the outcome of the suit." *Burdzel v. Sobus*, 2000 ME 84, ¶ 6, 750 A.2d 573, 575. A factual issue is genuine when there is sufficient supporting evidence "that would require a fact-finder to choose between competing versions of the truth at trial." *Inkel v. Livingston*, 2005 ME 42, ¶ 4, 869 A.2d 745, 747 (quotation marks omitted).

To survive a defendant's motion for summary judgment on a claim as to which the plaintiff has the burden of persuasion, a plaintiff must present a *prima facie* case on each element of the claim that the motion puts into contention. *See Quirion v. Geroux*, 2008 ME 41, P 9, 942 A.2d 670, 673 (negligence claim); *Reliance Nat'l Indem. v. Knowles Indus. Servs. Inc.*, 2005 ME 29, ¶ 9, 868 A.2d 220 (subrogation); *Rippett v. Bemis, supra*, 672 A.2d at 84 (defamation). Plaintiffs have the burden on all three counts of their complaint.

III.    ANALYSIS

A.      Federal Preemption by Labor Management Reporting and Disclosure Act (LMRDA)

As a threshold matter of law, Defendants argue that LMRDA, 29 U.S.C.S. §§ 401-531 (LexisNexis 2002 & 2011 Supp.) preempts Plaintiffs' causes of action because they are attempts on attacking the propriety of the union trusteeship. Defendants point to the following statutory provision:

> In any proceeding pursuant to this section a trusteeship established by a labor organization in conformity with the procedural requirements of its constitution and bylaws and authorized or ratified after a fair hearing either before the executive board or before such other body as may be provided in accordance with its constitution or bylaws shall be presumed valid for a period of eighteen

13

months from the date of its establishment and shall not be subject to attack during such period except upon clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowable under section 302 [29 USCS § 462].

29 U.S.C.S. § 464(c). Plaintiffs also cite *Farrell v. International Brotherhood of Teamsters*, 888 F.2d 459 (6th Cir. 1989), and *Morris v. Hoffa*, 2001 U.S. Dist. LEXIS 16692 (E.D. Pa. Oct. 12, 2001). Neither of these cases, however, involved a defamation claim brought by a union member against the international or national union organization. Further, Plaintiffs are not attacking the trustee process or the imposition o the trusteeship; their causes of action sound fully in common law torts. Finally, the court agrees with the reasoning of the court in *Sowell v. International Brotherhood of Teamsters*, in which the court determined that common law claims against a union were not preempted by LMRDA, and LMRDA is not a complete preemption statute. 2009 U.S. Dist. LEXIS 110339, at *11-*12 (S.D. Tex. Nov. 24, 2009). Thus, Plaintiffs' claims are not preempted by the LMRDA.

B. Privileged Communication

Only unprivileged defamatory communications are actionable. *See Lester*, 596 A.2d at 69. Defendants argue that the statements in the March 17, 2008, letter are subject to an absolute privilege because the letter initiated the trustee hearing process, which Defendants assert is quasi-judicial in nature. *See* 29 U.S.C.S. § 462 ("Trusteeships shall be established and administered by a labor organization over a subordinate body only in accordance with the constitution and bylaws of the organization which has assumed trusteeship over the subordinate body"). (*See* Supp. S.M.F. ¶¶ 34-36; Opp. S.M.F. ¶¶ 34-36 (outlining the IAMAW Constitution's provisions that allow the IAMAW President to place a Local Lodge in trusteeship).)

Maine recognizes an absolute privilege for parties to litigation:

14

> A party to a private litigation or a private prosecutor or defendant in a criminal prosecution is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding.

RESTATEMENT (SECOND) OF TORTS § 587; *accord Raymond v. Lyden*, 1999 ME 59, ¶ 6, 728 A.2d 124. Defendants cite no Maine case law on point in support of their claim of absolute privilege for a private trusteeship hearing, but point to sections 585 and 587 of the Restatement regarding judicial proceedings.

Section 587 states that "[j]udicial proceedings include all proceedings in which an officer or tribunal exercises judicial functions" as identified in section 585, comments *c* and *f.* RESTATEMENT (SECOND) OF TORTS § 587 cmt. f. The comments to section 585 indicate that in addition to formal judicial process, judicial proceedings can also include arbitration, proceedings before a public utility commission or a compensation board, and a grievance arising under a collective bargaining agreement. *See* RESTATEMENT (SECOND) OF TORTS § 585 cmt. b, c. While these examples suggest that absolute privilege might extend to the trustee hearing, the hallmark of each of these proceedings is a determination of rights of an individual or entity by a neutral decision maker. The sole purpose of a trusteeship hearing is to determine whether the trusteeship should continue or not (Supp. S.M.F. ¶ 36; Opp. S.M.F. ¶ 36), which involves the management of a private organization, and not a determination of rights of an individual or of an organization.

Ultimately, given the grounds on which the court decides the pending motion, it is unnecessary to decide whether the alleged defamatory statements were within the absolute privilege; were the court to decide that issue, it likely would conclude that the Defendants have not made a sufficient showing regarding the nature of the trusteeship proceeding to support applying an absolute privilege to statements made in the course of the proceeding.

15

C.    Consent

Defendants also assert that Plaintiffs consented to publication of the allegedly defamatory statements by virtue of their membership in IAMAW. Defendants, however, mischaracterize the case they cite: *Gabauer v. Woodcock*, 520 F.2d 1084, 1095 (5th Cir. 1975). The court does say that union members consent to having charges filed against them in accordance with the bylaws and constitution of the organization, but only as long as the charges are not made with malice i.e. they are conditionally privileged. *See id.* Consent is only an absolute defense to defamation when the defendant has "the consent of another to the publication of defamatory matter concerning him," unless "the republication of defamatory matter is made in response to inquiries that the person defamed makes to ascertain the source of defamatory rumors that are current concerning him." *See* RESTATEMENT (SECOND) OF TORTS § 583. That is not the case here.

D.    "Of and Concerning"

In addition to the required elements of a defamation, slander, or false light action, "in order for written or spoken language, otherwise defamatory, to be actionable, it must be 'of or concerning the plaintiff.'" *See Hudson v. Guy Gannett Broadcasting Co.*, 521 A.2d 714, 716 (Me. 1987). "A defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer." RESTATEMENT (SECOND) OF TORTS § 564 (1977) (quoted in *Hudson*, 521 A.2d at 717.) Whether a statement is of and concerning a plaintiff is a question of fact. *See Hudson*, 521 A.2d at 716.

Defendants contend that the Plaintiffs were never referred to by name in any of the alleged defamatory statements, which identified a group of "officials" and referred to the

16

conduct of the Local S6 generally. (Supp. S.M.F. ¶ 72.)[22] Defendants are correct that the letters in question do not refer to any of the Plaintiffs by name, but do refer to "Lodge Leaders" and "Lodge officials."[23] Nevertheless, Plaintiffs have not provided any affidavits of recipients of the alleged defamatory statements indicating they understood the statements in the subject letters to "Lodge leaders" and "Lodge officials" to refer to the Plaintiffs. *See Hudson*, 521 A.2d at 716. Instead, Plaintiffs argue that such affidavits are not necessary and, based upon all the evidence in the record (such as the animosity between the Local and the IAMAW/GL and the re-run election), a reasonable jury could conclude that the letters refer to the Plaintiffs. Defendants argue, however, that the absence of affidavits is irrelevant because any affidavits asserting that the statements were understood to refer to the named Plaintiffs would be insufficient to meet the Plaintiffs' burden under *New York Times Co. v. Sullivan*.

In *New York Times Co. v. Sullivan*, the Montgomery, Alabama police commissioner L.B. Sullivan filed suit against the New York Times for inaccurate statements in an advertisement regarding the civil rights movement that generally referred to police but not the commissioner

---

[22] Plaintiffs counter, without a record citation, "everyone in the union knew who their officers were" and "the press reported the names of the plaintiffs, especially Keenan's." (Opp. S.M.F. ¶ 72.) Plaintiffs, however, are not pursuing any defamatory statements in press coverage.

[23] Specifically, the March 12, 2008, makes two references to Local S6 officials. The first is as follows:

As you know, we have made numerous efforts to work with *Lodge officials* and to bring this Lodge into compliance with IAM policies and procedures, as well as relevant legal requirements. To date, many of our efforts have been unsuccessful, and with critical contracts negotiations pending for a unit of more than 3000 IAM-represented employees, I believe we must take immediate action to protect our members.

(Buffenbarger Dep. Exh. 7 at 1 (emphasis added).) The letter also states that the Local S6 is endangered by "[p]ermitting the rampant viewing and accessing of substantial amounts of pornography and pornographic materials on union computers during union-paid time by various *Lodge officials.*" (Buffenbarger Dep. Exh. 7 at 2 (emphasis added).)

The March 17, 2008, letter contains three references to Local S6 officials: 1) "For some time, the IAM has received reports of financial and other mismanagement at Lodge S6. We have tried to work with *Lodge officers* to correct these problems, but recent event have made it clear that stronger steps are needed"; 2) "*Lodge leaders* failed to follow IAM election policies and procedures prior to the Lodge's election last Fall"; and 2) "All current *Lodge officials* are hereby suspended from their union positions . . ." (Buffenbarger Depo. Exh. 9 at 1, 2, 3 (emphasis added).)

The August 12, 2008, letter states only in reference to Local S6 officials: "A new reporting policy has been implemented for all Local officers, stewards and committee members to insure accurate accounting of lost-time payments." (Buffenbarger letter dated August 12, 2008, at 2.)

17

by name. 376 U.S. at 257-58. To prove that the statements were in reference to him, Sullivan provided affidavits of recipients indicating they understood the defamatory statements to refer to Sullivan. *Id.* at 289. The United States Supreme Court concluded that these affidavits were inadequate, because none of the affidavits

> suggested any basis for the belief that [Sullivan] himself was attacked in the advertisement beyond the bare fact that he was in overall charge of the Police Department and thus bore official responsibility for police conduct; to the extent that some of the witnesses thought [Sullivan] to have been charged with ordering or approving the conduct or otherwise being personally involved in it, they based this notion not on any statements in the advertisement, and not on any evidence that he had in fact been so involved, but solely on the unsupported assumption that, because of his official position, he must have been.

*Id.* at 289. The Court specifically rejected the reasoning of the Alabama Supreme Court that any criticism of the police generally "is usually attached to the official in complete control of the body." *Id.* at 291 (quoting *New York Times Co. v. Sullivan*, 144 So. 2d 25, 39 (Ala. 1962)).

In the present case, most of the references in the letters are to the Local S6 generally, but, unlike *New York Times Co. v. Sullivan*, the letters also refer to union officials and leaders. It is undisputed, however, that the Local S6 had 60 union officials. (Supp. S.M.F. ¶ 37; Opp. S.M.F. ¶ 37.) Plaintiffs have not provided any evidence that recipients understood Plaintiffs (and not the other 56 union officials) to be the targets of the alleged defamatory statements. Nor have Plaintiffs provided any explanation of why a recipient might understand the statements to refer to the Plaintiffs, other than their status as elected officials.

Faced with the lack of affidavits and the reasoning in *New York Times Co. v. Sullivan*, Plaintiffs have failed to show that the alleged defamatory statements in any of the subject letters were of and concerning them.

E.     Actual Malice

Finally, Defendants argue that Plaintiffs have not met their burden of showing actual malice on the part of Defendants by clear and convincing evidence. Evidence of actual malice

18

typically falls into three categories: "(1) 'fabricated'; (2) 'so inherently improbable that only a reckless man would have put [it] in circulation'; or (3) 'based wholly on an unverified anonymous telephone call' or some other source that the defendant had 'obvious reasons to doubt.'" *Tavoulareas v. Piro*, 817 F.2d 762, 790 (D.C. Cir. 1987) (en banc) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)). Further,

> reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant *in fact entertained serious doubts as to the truth of his publication.* Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*St. Amant*, 390 U.S. at 731 (emphasis added).

The court first notes that Plaintiffs do not seriously contest the accuracy of most of the statements in the three subject letters.[24] Plaintiffs' pleadings largely consist of unsupported conclusory statements that the allegations in the subject letters were false, excepting the allegations regarding pornography and child pornography. Nevertheless, Defendants have not moved for summary judgment on the truth or falsity of the statements, only on "defendant's attitude towards the truth or falsity of the publication[s]." *Tucci*, 464 A.2d at 166.

As a technical matter, Plaintiffs do not provide any record citation in their denial of paragraphs 63 through 65 of Defendants' supporting statement of material facts, and thus have essentially admitted that Defendants did not act with actual malice. (*See* Opp. S.M.F. ¶¶ 63-65.) Plaintiffs focus on the fact that the trial committee did not conclude that many of the allegations in the letters were sufficiently proved to constitute grounds for continuing the

---

[24] For example, the only false statement in the August 12, 2008, letter that Plaintiffs allege is regarding the trial committee's conclusion that there was "clear evidence of widespread viewing of pornography on computers at the Local Lodge offices." (Buffenbarger letter dated August 12, 2008, at 2.) This statement, however, is a substantially true account of the committee's conclusions, as admitted by the Plaintiffs and supported by the hearing report. *McCullough v. Visiting Nurse Serv. of S. Me., Inc.*, 1997 ME 55, ¶ 10, 691 A.2d 1201 (citing RESTATEMENT (SECOND) OF TORTS § 581A cmt. f (1977)) (explaining that a substantially true statement is not actionable even if it is technically inaccurate). (*See* Supp. S.M.F. ¶ 51; Opp. S.M.F. ¶ 51; Buffenbarger Decl. Exh. G at 7.)

19

trusteeship, but that argument misses the point. The inquiry is to whether Defendants published the statements with recklessly disregard to their truth or falsity at the time of publication, not whether those allegations were later determined not to be grounds for continuing a trusteeship. Further, Plaintiffs' argument that IAMAW and Buffenbarger did not adequately investigate the allegations is not sufficient to demonstrate actual malice in the absence of a showing that contradictory evidence was also presented to the Defendants. *See St. Amant,* 390 U.S. at 731.

Plaintiffs' strongest argument is in regards to the allegations of the viewing of pornography in the March 12, 2008, letter and the March 17, 2008, letter and the child pornography allegation in the March 17, 2008, letter. Upon the court's review of the record, which includes documentary evidence of the photographs found on Local S6 computers in February, Plaintiffs have failed to show by clear and convincing evidence that Defendants in fact entertained serious doubts about the truth of their assertions, or otherwise, acted with reckless disregard of the truth or falsity of the allegations.

Plaintiffs have shown there is a genuine issue of fact about whether the Defendants acted with ill will toward the Plaintiffs, but, for reasons noted above, that is not a material fact—what is material under *New York Times v. Sullivan* is "defendant's attitude towards the truth or falsity of the publication rather than defendant's ill will or animosity against plaintiff. *Tucci v. Guy Gannett Publg. Co, supra,* 464 A.2d at 166 (ellipsis omitted). For that reason, Plaintiffs have failed to make a *prima facie* showing that the Defendants acted with actual malice for purposes of *New York Times v. Sullivan,* entitling the Defendants to summary judgment on that basis.

## CONCLUSION

Based on the foregoing, the Defendants are entitled to summary judgment on two alternative but independently sufficient grounds: in the face of Defendants' motion for summary judgment, Plaintiffs have failed to make a *prima facie* showing either that the alleged defamatory statements were "of and concerning" the individual Plaintiffs, or that Defendants acted with actual malice.

The Motion for Summary Judgment of Defendants International Association of Machinists and Aerospace Workers, R. Thomas Buffenbarger, and Lynn D. Tucker is GRANTED and judgment is entered in favor of Defendants on Counts I, II, and III of Plaintiffs' Complaint, being all counts.

Pursuant to M.R. Civ. P. 79, the clerk is hereby directed to incorporate this Order and Judgment into the docket by reference.

Dated 23 February 2012

A. M. Horton
Justice, Business and Consumer Court

Entered on the Docket: 2.23.12
Copies sent via Mail ___ Electronically ✓

21

STATE OF MAINE
CUMBERLAND, ss.

BUSINESS AND CONSUMER DOCKET
Location:    Portland

MICHAEL KEENAN et al
    Plaintiff

v.

DOCKET NO. BCD-CV-2010-42

INTERNATINAL ASSOCIATION OF MACHINISTS
AND AEROSPACE WORKERS et al
    Defendant

## COUNSEL OF RECORD

| Party Name: | Attorney Name: |
| --- | --- |
| Michael Keenan | Guy Loranger, Esq. |
| | Leon Rosenblatt, Esq. |
| Troy Osgood | Guy Loranger, Esq. |
| | Leon Rosenblatt, Esq. |
| Michael Cyr | Guy Loranger, Esq. |
| | Leon Rosenblatt, Esq. |
| Cathy London | Guy Loranger, Esq. |
| | Leon Rosenblatt, Esq. |
| Int. Assoc. Machinists | David Webbert, Esq. |
| RT Buffenberger | David Webbert, Esq. |
| Lynn Tucker, Jr. | David Webbert, Esq. |